## PERRY *v.* MICHIGAN ALKALI CO.

RELEASE—ACTION—PERSONAL INJURY—EFFECT.

Where, in an action for personal injury, it appears that defendant paid plaintiff's hospital expenses and his wages while off duty as a result of the injury, for which plaintiff signed a receipt acknowledging such payments to be in full of all claims and demands on account of the injury, and that on being informed after suit was brought that he could not sue defendant and remain in its employ, plaintiff deliberately stated that he did not wish to sue the company, and tried to discontinue the suit, but could not, on account of having placed the management of the suit in the hands of attorneys, who were to have a portion of the judgment, and no fraud or overreaching on the part of defendant appears, a verdict is properly directed for defendant.

Error to Wayne; Rohnert, J. Submitted October 25, 1907. (Docket No. 137.) Decided December 30, 1907.

Case by Harry B. Perry against the Michigan Alkali Company for personal injuries. There was judgment for defendant on a verdict directed by the court, and plaintiff brings error. Affirmed.

*John M. Feier, Proctor K. Owens,* and *Lehman &
Riggs,* for appellant.

*Gray & Gray,* for appellee.

Defendant operates 15 coke ovens which are situated
upon an iron platform about 18 feet above the ground, are
joined together in a row, and are 7 feet high. The plat-
form upon which the ovens rest extends from 3 to 4 feet
on the east and upon the west forms a large wharf to re-
ceive the coke as it is pushed out of the ovens. The ovens
are fed with coal from the top. There are doors upon the
east and west sides of the ovens, several feet above the
platform. In making the coke these doors are sealed with
clay. For the purpose of reaching them, a ladder con-
structed like the ordinary stepladder, 20 inches wide and
5 feet high, with 6 steps, is provided. This ladder has
hooks upon the top which for safety are hooked over an
iron rod near the top of the ovens. It is moved from
oven to oven as required. It stands at an angle of about
45 degrees, the foot of the ladder being $2\frac{1}{2}$ feet from
the edge of the platform. A short distance east of the
ovens is another platform with iron rails or tracks upon
it. Upon this track is situated a machine, called the
pusher, which is operated with electricity. The pusher is
about 20 by 26 feet; it is provided with what is called an
arm, used to push the coke out of the oven. For this pur-
pose it is moved along the track from oven to oven, the
doors are opened and the ram enters the east door and
pushes the coke out at the west door. This pusher is
from 3 to $3\frac{1}{2}$ feet above the platform. Upon its side next
to the ovens is a narrow board platform similar to the
running board of an open street car. Above this narrow
platform is a rod called an angle iron. Some parts of the
pusher extend over the platform.

The time of filling each oven is noted in a book kept for
that purpose. When the ovens are filled this book is
placed in the push car to indicate the time when each oven

is to be opened and the coke pushed out. Two ways are provided for reaching the pusher, one by stairs from the ground, and the other by stepping from the platform in front of the ovens onto the platform upon the side of the pusher. The foreman of the coke ovens, a witness for plaintiff, described these methods, as did also other witnesses. He testified:

"There was no rail to this platform upon which the ladder stood. If an employé was on the platform at the oven, and he wanted to get over to the pusher, he would get there as follows: There was a 2x10 plank to get upon down on the bottom of the channel iron just above him, and he would climb up by way of that onto the pusher. Nearly all the employés, except Perry, I guess, so far as I know, got up that way. He was the only man that used the ladder to get onto the pusher. Sometimes he would go up the way we did.    *    *    *

"There was a platform on the push car, a sort of running board. They would get onto the platform and then step up, it was a high step up, you could put your knee on it and step up onto the push car from the platform. It made it a rather high step. The board was about 6 feet long and 10 inches wide. That ran along the platform near the coke ovens, and it would be carried along with the push car. The same board is there yet.    *    *    * The purpose of that board was to assist in getting up on the push car from the platform. If one desired to get from the coke oven to the push car that board was to assist in getting upon it.    *    *    *

"It was about 3 feet and a few inches above the level of the iron platform and about 10 inches from the top of the pusher. A man would have to step 3 feet and 10 inches or more to get up there without a ladder. He could put his hand up there and pull himself up. They usually put their knee upon that board instead of their foot, and that is the customary way they got up there when they would go up in a hurry. They could go up the ladder on the other side by going down and going clear around, but they generally went this short way. It was the only way they could get there unless they went down and went to the other side, and they generally went this short way. That was the custom of every one known to myself."

Plaintiff was a tar chaser, a work which it is unnecessary to describe.  He also did other work when called upon.  Plaintiff had gone into the push car and eaten his lunch; had left the push car; had come down upon the platform and there met the foreman of the ovens who was about to take the time book and put it in its usual place in the car.  Plaintiff had forgotten his mittens which he had left in the car, and was about to return to get them when he met the foreman with the time book.  Plaintiff told him that he would take the book into the car.  The foreman gave it to him and turned away.  Immediately thereafter plaintiff fell from the oven platform into the space below and was seriously injured.  Instead of climbing to the push car in one of the two ways provided, he went upon the ladder, turned his back to the ladder, and, in attempting to step upon the pusher platform and reach the angle iron with his hands, he fell and was injured.  The negligence relied upon is a defective ladder.  The steps or rungs of the ladder were laid upon cleats fastened to the inside of the uprights and nails driven from the outside into the rungs.  After the accident it was discovered that one side of the second rung had gone down.  It is claimed that the ladder was in a defective condition, and that a proper inspection would have discovered it.  Plaintiff testified that he stepped upon the second rung with his left foot, and then turned to step upon the pusher, and while so doing fell.  When the plaintiff had rested his case, the court directed a verdict for the defendant, chiefly upon the ground that he was using the ladder for a purpose for which it was not intended, and that in doing so he assumed the risk.

GRANT, J. (*after stating the facts*).  1. The instruction was correct.  The defendant had provided two safe ways by which to reach the pusher.  Plaintiff chose a third way which was fraught with danger if he slipped, or the ladder, for any reason, gave way.  Had he been using the ladder for the purpose for which it was intended

and a rung had broken when ascending the ladder, no injury, in all probability, would have resulted, as plaintiff would naturally have had at least one of his hands upon a rung or side of the ladder.  It is evident that a jump from a rung of the ladder to the platform would subject it to a greater strain.   To stand upon this ladder with one's back to it and attempt to jump onto the pusher and reach a rod above the platform was per se dangerous, and such dangerous practice by the plaintiff, although frequent, did not impose upon the defendant the duty to see that the ladder was strong enough and in good repair enough to justify its use for the purpose to which the plaintiff put it. *Kopf* v. *Monroe Stone Co.,* 133 Mich. 286.   Plaintiff knew the dangers and assumed the risk.

2. The instruction was correct for another reason. Plaintiff had settled any claim he had against the company, and had given a receipt therefor.   Defendant paid all plaintiff's hospital charges, $158, and his full pay while off duty, $163.62.   He signed a receipt containing these two items, acknowledging them to be "in full payment of all claims and demands of whatsoever nature on account of injuries received by me at coke oven plant January 27, 1904."   He was off duty from January 27th to April 30th, and the receipt was dated June 3d.   As soon as he recovered so as to work he was employed by the company in light work at $1.35 a day, his former pay having been $1.75.   While he was in the employ of the company this suit was commenced.   When the summons was served upon the defendant he was notified that he could not sue the company and remain in its employ; he must discontinue the suit or leave the company's employ. He took time to deliberate; went home to see his wife, and then made a statement saying that he signed the settlement of June 3d with full and perfect knowledge as to its legal effect and force; that he ratified and confirmed it, and that the suit was commenced without his knowledge or consent, and he agreed to forthwith notify the attorneys of record to discontinue it.   He did so notify them,

but previous thereto two attorneys had obtained a contract from him by which he placed the matter absolutely in the hands of his attorneys, and they were to receive 50 per cent. of any judgment they should obtain.

Plaintiff testified upon the trial that he had never authorized suit to be brought; that he did not want to sue the company, and that he was willing to work for them:

"*Q.* Did Mr. Ford say that they could not have a man in their employ suing the company, and if you were suing the company that you would have to withdraw the suit or leave the employ of the company?

"*A.* Yes, he did tell me that.

"*Q.* And you understood that you could do either one you wanted to?

"*A.* Didn't I go and try to withdraw it?

"*Q.* Then you wanted to withdraw it?

"*A.* Yes, but what could I do?

"*Q.* You mean you couldn't?

"*A.* Nobody would let me."

I find no evidence showing that there was any fraud on the part of the company in making this settlement; that plaintiff fully understood what he was doing and deliberately made it. While the court did not direct a verdict upon this ground, but partly upon the ground that it was the duty of the plaintiff to tender back the money paid, which he had not done, still, if for any reason the court should have directed a verdict, the judgment will not be reversed.

The judgment is affirmed.

HOOKER, J., concurred with GRANT, J.

MONTGOMERY, J. I concur in the result upon the second ground stated by Mr. Justice GRANT.

BLAIR, and OSTRANDER, JJ., concurred with MONTGOMERY, J.