STORY v. PAGE.

1. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.

Testimony must be viewed in light most favorable to plaintiff where defendants claim verdict should have been directed in their favor or motion *non obstante veredicto* granted and, so viewed, questions of negligence and contributory negligence may have been questions for jury under evidence presented.

2. RELEASE—INDEMNITY AGREEMENT—PARENT AND CHILD—FUNERAL EXPENSES.

Release from liability for death of 17-year old son of signers, his sole heirs, secured by adjuster for defendants' insurer on day of funeral, three days after accident, for estimated amount of funeral expenses *held*, not unfair or secured through over-reaching so as to require that it be set aside, where parents were not illiterate, apparently had some doubt as to defendants' liability, read portions of release before cashing draft attached thereto and release stated it released defendants from all claims of every nature, and signers agreed to indemnify defendants for claims brought against them.

3. SAME—CONTRACT.

In the law of contract, equivalents are exchanged but the very essence of a release is to avoid litigation, even at the expense of strict right.

4. Same—Fraud—Evidence.

Evidence of fraud, to justify setting aside release of doubtful claim, which has been executed by competent persons, must be clear and positive.

5. Same—Parties Bound—Administrators.

Releases, executed by parents of 17-year old son, for consideration of estimated funeral expenses, in which all claims were expressly released and signers agreed to indemnify alleged tortfeasors from all claims of liability arising out of the accident *held,* binding on such signers, the son's sole heirs, and father who subsequently was appointed administrator of son's estate and brought action; where there was no showing of any debts owed by son's estate.

Appeal from Allegan; Miles (Fred T.), J. Submitted January 14, 1937. (Docket No. 54, Calendar No. 39,288.) Decided May 21, 1937.

Case by Thomas J. Story, administrator of the estate of Merton J. Story, deceased, against Glen Page and Clarence Laws for fatal injuries sustained by decedent when struck by truck backed in private drive. Verdict and judgment for plaintiff. Defendants appeal. Reversed without new trial.

*Leo W. Hoffman* and *Carl E. Hoffman,* for plaintiff.

*Harry C. Howard, William J. Howard* and *John C. Howard,* for defendants.

Butzel, J. A truck owned by Clarence Laws and driven by Glen Page, defendants herein, collected milk from various farms and transported it to the Otsego Sanitary Milk Company. On January 24, 1936, owing to the fact that the roads were blocked by snow drifts, Thomas J. Story was asked to bring his milk to the West farm not far distant. Defendants' truck had been driven into the driveway along-

side the West farmhouse and stopped opposite a
porch which ran along the west side of the rear por-
tion of the house. Story, accompanied by his sons
Melvin and Merton, the decedent, ages 10 and 17
respectively, brought the milk over to the West
home in a model A Ford car which Story also drove
into the driveway, stopping behind the truck.

After the milk had been transferred from the
Story car to the truck, Story started to back the
Ford car along the driveway towards the road.
Melvin, the decedent, sat alongside of him. The car
stalled in the driveway, whereupon decedent, Glen
Page, the driver of the truck, and Morris Ash, a col-
ored boy who had accompanied him, proceeded to
push from the front of the car to start its going back
again towards the road. All parties knew, or should
have known, that it was the purpose to back both
cars into the road. After the Ford car started up,
Page returned to the cab of the truck, the motor of
which appears to have been running, though there is
testimony to the contrary. The testimony indicates
that before starting the truck Page called out, "Is
all clear?" and the answer came back, "All clear."
There is some negative testimony. Thomas J. Story
testified that he did not hear Page call out, and Ash
stated he did not hear anyone answer. The truck
started moving backwards, but in the meantime, the
Ford, which was backing towards the highway,
stalled again and decedent, evidently standing in
front of the Ford with one hand on the radiator and
the other on the right fender and Ash standing at
the left fender tried to push the car back towards the
road. Believing that the Ford car was moving into
the road, Page continued to back the truck. Story
thereupon blew his horn and "started to holler."
Ash, who was nearer the side of the car, stepped

away, but decedent, intent upon pushing the car, failed to get out of the way. The truck backed into the Ford, pushing it some eight feet, and decedent was badly crushed. At first, when he was being driven home in the Ford car, it was not thought that he was seriously injured. However, just as he reached his home, he collapsed and shortly thereafter died, undoubtedly as a result of the injuries received. The funeral took place three days later.

Plaintiff's son Melvin testified that his father sounded the horn of the car and ''hollered'' as the truck came closer. Undoubtedly Ash heard it for he got out of the way, but decedent did not heed the warning or look around.

Decedent's father testified:

''I did warn them, I called to them and blew my horn. My boy stayed right in that position, but Ash stepped away just in time. He got away, but my boy did not look around, but he kept pushing, and this truck kept coming until the accident happened as I have detailed it.''

He testified that his boy wore a leather cap covering the ears, but there is no testimony that such cap would prevent one from hearing a horn or a loud voice. Page, the truck driver, testified that he and Mr. Story were discussing the accident and Mr. Story stated that he did not see why his boy did not get out of the way, because he blew his horn. Ash testified he heard the tooting of the horn and the ''hollering,'' and as he looked around, he saw the truck and jumped out of the way; that Merton was standing by his side to the left, not very far from him and that he looked around too and that when he jumped, decedent stood there a moment before the truck came and it looked as if he were trying to go

over the lefthand fender or the radiator; that he (Ash) knew that the truck was going to hit somebody and in answer to the question of whether he just made it, he stated that he had sufficient time. Mrs. West, at whose farm the accident happened, testified that she heard Page call, "Is everything all clear?" and that she heard a shout but did not catch the words.

The case differs from that of a truck backing upon an open road where the driver fails to look, or where someone is injured without notice of a car that is about to back up in a driveway. Here, all the parties, including the decedent, were engaged in getting the car back into the road. Page, the driver, worked alongside decedent and helped to push the Ford when it stalled the first time. When the car started up again, Page left the parties and entered the cab of his truck and started driving backwards towards the Ford car which had become stalled again. Decedent's father sounded the horn and called out. The colored boy heard decedent's father call and looked around and jumped out of the way. He stated that deceased looked around too, but the latter evidently failed to pay any attention to the impending danger and the warnings.

There is a serious question as to whether defendant driver was guilty of negligence at all — whether he did anything that a prudent man would not have done or failed to do something that a prudent man would have done, under similar circumstances. There is also considerable doubt as to whether plaintiff has shown that decedent was free from contributory negligence. Inasmuch as appellants claim that a verdict in their favor should have been directed and a motion *non obstante veredicto* granted, we must look upon the testimony in the light most

favorable to plaintiff and conclude that there may possibly be jury questions as to negligence and contributory negligence.

We have discussed the question of liability to show that the parents of decedent may also have had their doubts as to the liability of defendants when they executed releases in consideration of only the amount of the funeral expenses. On the day of the funeral, shortly after the return of the family from the cemetery, the adjuster of the company that carried the insurance on the milk truck, accompanied by both the defendants, went to the Story home. The adjuster asked Mr. Story whether he cared to talk to him at that time. Story stated he first wanted to consult his wife and after receiving her consent, a discussion ensued. The Storys accepted the offer to settle the entire liability for an amount equal to the funeral expenses. Story and wife testified that they were led to believe that the release only discharged claims for funeral expenses, but did not relate to any other liability, and that the adjuster stated that it was the custom of his principal to pay the funeral expenses immediately. The Storys thus attempt to nullify the plain words and effect of the full and complete releases signed by them. Several releases were executed and in one of them Story and wife agreed to hold the defendants and the Otsego Sanitary Milk Company harmless from all claims of liability. A voucher draft for the amount of the estimated funeral expenses was delivered to the Storys. There was attached to it a full and absolute discharge from all claims or causes of action of every kind that arose out of the accident. It was duly signed by the Storys. Another release, completely discharging the defendants from every kind of action or claim and signed by both Mr. and Mrs. Story,

contains the following statement written by them above their signatures:

"I have read this and understand this is a release. I have read this and understand that it releases all claims."

The voucher draft with the release was left with the Storys who, in addition to signing the release thereto attached, also indorsed the draft and cashed it the following day. Although they testified that they believed that they were only giving releases for funeral expenses, Story on cross-examination admitted that he might have read some part of the voucher draft before cashing it. The Storys further agreed that they would go to Allegan, as soon as the roads were in better condition, to have an administrator appointed so that he could give an additional release and that they would call up the adjuster of the insurance company, charges reversed, so as to meet them there. Two days after cashing the draft containing the release, the Storys, mindful of their promise, called up the adjuster to arrange a meeting in the probate court for the county of Allegan. When they arrived in Allegan, Story went out to obtain legal advice while his wife and the adjuster met in the probate office. Story subsequently arrived and stated he was not bound by the releases, tendered a return of the amount of the draft, was appointed administrator and brought this suit. He claimed that the releases were obtained through fraud and are not binding.

While it is true that the Storys were not represented by counsel when the releases were executed and it was atrocious taste for the adjuster to intrude at the moment, nevertheless, he first secured the consent of the Storys before discussing the settle-

ment.  The Storys were not illiterate people.  Mr.
Story had been township treasurer for two terms
and had charge of the collection of taxes and his
wife at times helped him with the tax roll.  They
kept the draft over night with the full and complete
release discharging all liability and must, or should
have, known what it contained before indorsing it
and cashing it the following day.  They were still
mindful of their agreement when two days later
they called up the adjuster to meet them in Allegan
in accordance with their agreement.  They claim
that at all times they were only settling for the fu-
neral expenses and not discharging all possible
claims.

The testimony does not bear out the claim that the
Storys were overreached by the insurer, particu-
larly when there is a very grave question as to
whether there was any liability whatsoever.  Writ-
ten releases signed by them may not be set aside un-
der the circumstances in the present case.  As stated
in *Kirl* v. *Zinner,* 274 Mich. 331, 334:

"A compromise and release is not to be confused
with the law of contract, in which equivalents are ex-
changed, for the very essence of a release is to avoid
litigation, even at the expense of strict right."

While at times we have held that plaintiffs may
tender the return of moneys paid to them on a re-
lease, where an inadequate consideration has been
paid to persons not in a position to be able fully to
exercise their mental faculties, or who have been in-
duced by fraud to enter into such release, we find
that such are not the conditions in the instant case.
Parties may not, after executing written releases in
pursuance of a compromise of a claim, not free from
doubt, promiscuously change their minds, and set

aside the settlement, except where the proof of the fraud is clear and positive. Such conditions did not exist in the present case. The releases were binding on the parties.

The question arises whether, the releases having been given by the sole heirs of the decedent's estate, they were binding upon the administrator, particularly when there is no showing that there were any debts and the decedent was a minor.

In *Priest* v. *Watkins,* 2 Hill (N. Y.), 225 (38 Am. Dec. 584), where a note belonging to the estate of an intestate was paid to the widow who subsequently joined with another in taking out letters of administration and they then brought an action upon the note in their representative capacity, it was held that the letters related back to the time of the intestate's death and, therefore, payment to the widow was a bar to the action. See, also, *Stuber* v. *McEntee,* 142 N. Y. 200 (36 N. E. 878).

In the present case the releases given by the father were binding upon the estate as the father was subsequently appointed administrator. Other claimed errors need not be discussed.

The judgment is set aside and the case remanded to the circuit court for judgment for defendants, who will recover costs.

Fead, C. J., and North, Wiest, Bushnell, Sharpe, Potter, and Chandler, JJ., concurred.