DENTON *v.* UTLEY.

Release—General Release—Automobile Accident—Reformation of Instruments.

> General release of liability for personal injuries and property damage, arising from automobile accident, in consideration of $50, paid by defendant motorist's insurer, is reformed to release for property damage only, where there was no discussion at time release was executed of personal injuries by plaintiff who then knew of no personal injuries and who now makes claim for serious personal injuries proximately caused by the accident.

Appeal from Wayne; Moynihan (Joseph A.), J. Submitted October 3, 1956. (Docket No. 27, Calendar No. 46,894.) Decided November 26, 1957.

Bill by Vernon S. Denton against William Utley and Citizen's Mutual Automobile Insurance Company, an insurance corporation, to cancel complete release or to reform instrument so as to relate only to property damage and not to personal injuries. Decree for plaintiff. Defendants appeal. Affirmed.

*Paul B. Mayrand* and *George Stone,* for plaintiff.

*Carl F. Davidson* (*Roy P. Nelson,* of counsel), for defendants.

Smith, J. This case must be read with great care. We are upsetting the particular release here in-

---

References for Points in Headnotes

29 Am Jur, Insurance § 1261.
45 Am Jur, Release, § 20.
Avoidance of release of claims for personal injuries on ground of mistake or fraud relative to the extent or nature of the injuries. 117 ALR 1022.

volved. We are not saying that all releases are vulnerable. What we are saying is that releases have no particular immunity of their own to attack on the ground of mistake or fraud.* There is no form of words, there is no formula, no instrument, no transaction, that rises above the chancellor's scrutiny or resists his intervention. *"Fiat justitia ruat coelum."*

In the case before us Vernon Denton got into an automobile accident. At the time he had what he calls "collision insurance with a $50 deductible policy." The details of the accident are unimportant. It matters not to the issue before us who got to the corner first. Denton's car was badly hurt. The frame was sprung. He says he "didn't want it any more." So he "negotiated for a new car" with the Hammond Motor Sales. A bargain was struck. But Denton was short a little. He needed, in fact, the $50 that was coming to him, he thought, from the other driver's policy. (The other driver was defendant William Utley, whose insurance carrier was defendant Citizens' Mutual Automobile Insurance Company.) As Denton puts it, "I got in touch with them (Citizens' Mutual); I sent them a letter asking them to send me the $50 because I couldn't get my new car until I had that."

It was not immediately paid. Denton was restless. He "was using the company's car for transportation back and forth to work." This, he says, "was working a hardship on the company as well as myself;" it was "tying up the man I work for by using his truck." He called Citizens' Mutual "and asked them where the blazes my $50 was." The girl at Citizens' explained that they had had no report of the accident. Denton submitted one. Item 9 thereon con-

---

* Although the bill of complaint charged that the release "was obtained under fraudulent representation and circumstances, mistake and undue influence, and for a grossly inadequate consideration," the trial chancellor made no finding as to fraud, the appellees do not complain thereof, and we do not so find.

sisted of question and answer: "Were you or any-
one in your car injured? No." There seems to have
been no discussion of personal injuries. "There was
nothing else discussed," testified Denton, "with the
Citizens' Mutual Automobile Insurance Company,
other than the $50 deductible collision." We do not,
in fact, find Citizens' claiming otherwise. At any
rate, we are told, "The check came through in a day
or so and when it did, I went over there (to Mr.
Hammond, at Hammond Motor Sales) and they gave
me the check which I signed at that time and my new
car was given to me. The check that I received was
the check for the $50 deductible." This check was in-
dorsed by Denton. Did he read it before he signed
it? "I presume I did." On the reverse side, above
the indorsement is the following:

"RELEASE

"(Read Before Indorsing)

"Indorsement by payee/payees is acceptance of
the face amount of draft in full settlement, accord
and satisfaction of any and all claims, demands,
causes of action of every nature which he/they now
have or hereafter may have against any person, firm
or corporation charged or chargeable with respon-
sibility or liability because of the accident mentioned
on the face of this draft resulting in injury to him/
them and/or damage to his/their property and in
consideration of the payment of this sum hereby
remise, release and forever discharge all persons
from any further claim or payment because of said
accident and damage done herein.

"Indorsement:

"VERNON S. DENTON

"5470 Baldwin

"City"

Thereafter, we learn from the bill of complaint,
Denton "became seriously sick and ill, and discovered
the same was due to the injuries received by him in

the above-mentioned accident." He instituted suit at law for damages. The defendant Utley, and his insurer (Citizens') answered that Denton's action for personal injuries was "barred and released by virtue of the receipt by him of the aforementioned $50 on the company's draft No. 91874 which purported to contain a release of all of plaintiff's claims whether for injury to him or damage to his property." Plaintiff then filed in equity the bill before us, asserting that he had in fact suffered severe injuries to his person at the time of the accident, that those injuries "were not ascertainable or known at the time," and that if the "purported release has the effect now claimed for it by defendants Utley and the company, then such release was obtained under fraudulent representations and circumstances, mistake and undue influence, and for a grossly inadequate consideration." The bill further stated a tender of the $50 and prayed that the release "be canelled or reformed so as to constitute a release of plaintiff's property damage only with right to enforce his claim for personal injuries."

To all of this the defendants reply, in effect, that Denton had disavowed personal injuries both to his own insurance carrier and to them, that he read and fully understood the release conditions which purported to release all past, present, and future claims for personal injuries or property damage, that there was no fraud and no duress, if there was a mistake it was not mutual, and, most important of all, that "a release contract fairly entered into by competent parties with complete understanding of terms and without fraud, duress or overreaching will be upheld because society demands it." The issue tendered the trial chancellor was the validity of the release itself, conceding, for purpose of the tendered issue only, some injury in general from the accident, but none in specific detail. (Defendants answered,

,in part, that "plaintiff was aware of a limited amount of injury at the time the release was executed.") The necessary factual issues thus remain for the action at law. (Compare practice under the formerly-employed demurrer. *Belden* v. *Blackman,* 124 Mich 667.) The trial chancellor "cancelled, vacated and held for naught" the release, save as it pertained to property damages, and the case is before us on a general appeal.

The difficulty in the case arises, as always, from competing considerations. On the one hand, we have the stability of business transactions. It would, it is said, open the door to wholesale repudiation of releases were we to here uphold the trial chancellor, it would discourage settlements and it would increase litigation. On the other, we have an assertedly seriously-injured plaintiff, abandoned to his own resources, while an insurer reaps a windfall, having successfully avoided, through the payment of a trifling sum of money, any possibility of having to make good on an obligation it has been paid to assume.

The position of the defendants, summarily put, is that the "contractor must stand by the word of his contract," citing *Upton* v. *Tribilcock,* 91 US 45 (23 L ed 203), quoted in *Powers* v. *Indiana & Michigan Electric Co.,* 252 Mich 585. If this were the law under all circumstances the case would not detain us long. But it is questionable whether it was ever true (in the sense that a contract has always been enforceable according to its literal terms, *e.g., Thoroughgood's Case* [1582], 2 Coke Rep 9a [76 Eng Rep 408]; *Ricketts* v. *Pennsylvania R. Co.* [CCA] 153 F2d 757 [164 ALR 387]) and, with all certainty, we can say that it is not true today. Whether our law of contracts does, in truth, embody the subjective theory (see Whittier, The Restatement of Contracts and Mutual Assent, 17 Cal L Rev 441), or

whether the objective theory enunciates the true faith ( *e.g.,* 1 Williston, Contracts [Rev ed], § 35), the result is the same: *under some circumstances* a release is avoided. To those holding with the subjective theory, of course, this presents no problem should there be a variance between intent and expression. But even to those professedly adhering to the objective theory the problem is not a difficult one. It is of approximately the same order of difficulty as the problem of long division to the expert mathematician. The objectivists simply say that a contract is voidable where one party has made a mistake and the other "has reason" to know it. (2 Restatement, Contracts, § 503.) And what does a man have reason to know? He has reason to know no more and no less than a court deems it fair, from the posture of the parties and the circumstances of the case, to ascribe to his knowledge. So much for theories of contract. Both here reach the same result.

But we have merely rephrased our problem. We said that "under some circumstances" a release will be avoided. What are those circumstances? Why are they unique? The answer to those questions requires a perspective. The problem in the case before us concerns the law of mistake. The position of the plaintiff may be very simply stated. He said he was mistaken about the existence of any injuries. ("At that time [of the report to Citizens'] I didn't know I was injured. I couldn't tell them that I was.") Under what circumstances, then, will a mistake on the part of one or both parties to a release justify its avoidance?

We do not propose here even to summarize the black-letter catch titles of the law of mistake. Those interested in its broader aspects may refer to 2 Durfee and Dawson's "Restitution," where will be found some 400 pages of text, cases, and footnote material

ranging from cases on simple misunderstandings, through mistakes in integration, to those mistakes involving errors in basic assumptions. The point to be gathered from all of this material, these scores, these hundreds of cases, is that it is too late in the law to insist that the contractor must in all events stand by the literal words of his contract. Mistakes can happen. We have not yet reached the "Lawyer's Paradise where all words have a fixed, precisely ascertained meaning; where men may express their purposes, not only with accuracy, but with fulness; and where, if the writer has been careful, a lawyer, having a document referred to him, may sit in his chair, inspect the text, and answer all questions without raising his eyes." (Thayer, A Preliminary Treatise on Evidence [1898], 428, 429, as quoted by Frank, J., in *Zell* v. *American Seating Co.* [CCA], 138 F2d 641, footnote, p 648.) We, on the contrary, if we are to do justice, must raise our eyes. And raising them, what do we see?

We see, first of all, a wide expanse of the law which has had existence since earliest times: equity's traditional relief to contracting parties in cases involving fraud and mistake. In our exercise of this power we are frustrated by no form of words employed. If the parties before us have employed artifice and wile, if they have been deluded and betrayed, even, in many cases, by their own fallibility, we are not powerless to relieve them of the consequences. If the courts be asked, as they have been (*Nygard* v. *Minneapolis Street R. Co.*, 147 Minn 109, 112 [179 NW 642]), by one insisting upon the letter of the agreement, how could I possibly have framed the release in order to make it incontestable? What more could I have said than I did? If there are broader, more comprehensive terms than I have used, what are they? To these questions, and all like them, the chancellor's answer remains the same:

"If fraud or mutual mistake has induced the making of an unconscionable contract, courts ought to be more concerned about granting relief, than desirous of clinching future wrongs by making such contracts incontestable."

A part of this broad expanse of the law of mistake particularly concerns us here, relief from that instrument known as a release. It is a commonplace that relief is given upon a proper showing of fraud or mistake, as later cases well illustrate. But as to when, and why, and under what circumstances, the cases abound in distinctions both subtle and complex. It is said, for instance, that we must distinguish between mistake of a material past or present fact, and the mistake "of prophecy or opinion" concerning the future. The existence of the former, it is said, will justify rescission (or cancellation, or avoidance, or vacating) but not of the latter. Yet we may well ask, as a practical matter (as distinguished from a verbal technique), is it possible to completely divorce diagnosis from prognosis? Is there not an interrelation, even if not an interdependence? Is not a doctor's opinion as to prospects of recovery a representation as to an existing factual situation upon which all parties should be entitled to rely? See *Granger* v. *Chicago, Milwaukee & St. Paul R. Co.,* 194 Wis 51 (215 NW 576). Thus it is that we find Judge Bratton, in *Tulsa City Lines, Inc.,* v. *Mains* (CCA), 107 F2d 377, 381, saying: "In cases of this kind it is sometimes difficult, if not impossible, to draw a distinct line of separation between mistakes relating to present and future facts." Another common distinction urged is that between the unilateral mistake, so-called, and the mutual mistake. There is, of course, a difference. But from this should we automatically conclude that one presents a proper case for relief, the other not? It does not so follow. If one of the contracting parties

believes a material fact to exist, and it does not, he is mistaken. The other party (if the fact is truly material) either labors under the same misapprehension, in which case there is mutual mistake, or he knows better, in which case there is fraud. Either case appeals to our jurisdiction. "The statement made to plaintiff by defendants' physicians, that he had recovered, was one of fact. (Citing cases.) It was believed by plaintiff, and if it was also believed by the physician, the case is one of mutual mistake. If the statement was not believed by the physician, we have a case of fraud. In either case the plaintiff was entitled to rescind." *Matthews* v. *Atchison, Topeka & Santa Fe R. Co.*, 54 Cal App2d 549, 558 (129 P2d 435).

Distinctions are argued, likewise, between representations made by the releasor's doctor, and those by the doctor employed by the releasee, and between the extent of known injuries and the development of known injuries (this being a distinction peculiarly baffling and, I suspect, not completely understood even by those employing it). Since opinions, however, like lawsuits, should have a terminal point somewhere, we will not exhaust the catalog. It exists for all to see. But we have no wish to add to subtleties run rampant, much less to employ them. It is obvious to all who will pause and observe that a powerful force is here at work. For, despite the recital (and payment) of consideration, despite the employment of affirmations of full and complete understanding ("I have read the above and fully understand its meaning"), despite the doctrine of the sanctity of the written instrument, despite, in fact, the predictions of business frustration and collapse, the courts continue, in case after case, to set aside the most solemnly cast releases. As Wigmore, in his Treatise on the Anglo-American System of Evidence (3d ed), (vol 9), § 2416, put it, such is the

modern trend (p 55), "liberally relieving the party who has signed the release." Why? What is the powerful force?

The arguments against relief, the arguments made in favor of the strict letter of the agreement, the arguments against meddling on the part of the chancellor, are not new. Nor is it new that they are framed in terms of the most fearful consequences to the then-existing social order. It was long ago urged, for instance, that the existence of a trust should never be presumed from mere words of advice or recommendation, otherwise, it was said, the way would be "opened to the Lord Chancellor to construe or presume any man in England out of his estate." (Lord Nottingham, *Cook* v. *Fountain,* 3 Swanst 585, 592 [36 Eng Rep 984]; 6 Holdsworth, History of English Law, p 643). Yet a scant quarter-century later it was admitted that words of desire amounted to an express devise (*Eeles* v. *England,* 2 Vern 466 (23 Eng Rep 901); Holdsworth, *supra*), and today the ancient doctrine is all but forgotten, resting quietly with escuage relief and the writs relating to the enfranchisement of villeins. Likewise, a conveyance to a creditor in fee, with a provision for reconveyance if the debt were paid by a fixed date was at one time strictly construed. Against the protests that the law must take its course, lest all security transactions be jeopardized, again the chancellors interposed, not only on such narrow grounds as prevention of payment "by the sharp practice of the mortgagee" (5 Holdsworth, *supra,* 331) but upon the broader grounds of avoidance of the enforcement of penalties and usurious contracts. The doctrines of mortgage redemption are now a commonplace in our law, yet the volume of mortgage loans has increased at an ever-accelerated pace, despite early prophecies of disaster.

It should neither surprise nor deceive us that the ancient argument comes before us today in modern garb. Where once the courts were admonished, with respect to the law of trusts, to roil not the conscience lest any gentleman in England be presumed out of his entire estate, to disturb not the letter of the conveyance, lest all security transactions be jeopardized, now we are warned to leave untouched the letter of the release, lest no claim ever be settled, and litigations mount. The argument *in terrorem* fails here, as it has always failed, and for precisely the same reason: We exist solely to do justice and it shall be done.

In the particular case before us, involving a release, we confront merely a specialized application of the overriding principle that in its accomplishment of its mission, equity will strike down without hesitation any agreement resulting from oppression, fraud, mutual mistake of the contracting parties, or other evil. The cases rest upon this great principle, not upon the minutiae urged. It matters not how sweeping are the words involved. When their content cloaks iniquity they shall be vacated and held for naught. To put it affirmatively, any release, to be sustained, must be "fairly and knowingly" made. (*Farrington* v. *Harlem Savings Bank,* 280 NY 1 [19 NE2d 657]; Keefe, Validity of Releases Executed under Mistake of Fact, 14 Fordham L Rev 135 [1945].) Questions may arise under either of the dual requirements. As to the requirement of fairness, it should surprise no one that a release obtained from a father for a trifling sum on the day after his son's accident and while funeral arrangements were being made proved no bar to subsequent litigation. *Jordan* v. *Guerra,* 23 Cal2d 469 (144 P2d 349); contra in principle, *Story* v. *Page,* 280 Mich 34, 39. ("On the day of the funeral, shortly after the return of the family from the cemetery, the ad-

juster  *  *  *  went to the Story home.") The minimal requirement of fairness would seem to prevent pressing the bereaved parents for "a full and absolute discharge from all claims or cause of action of every kind that arose out of the accident" on the very day of interment.  Even the hypothetical reasonable man, for all of his equanimity, might well be suffering from shock and daze at this time, hardly at his bargaining best.  Included, also, in those cases turning on the requirement of fairness are those cases involving misrepresentations as to the true nature of the instrument executed, *Monahan* v. *St. Paul Coal Co.,* 193 Ill App 308, or where the releasor is, at the time of the execution of the release, under the influence of drugs or opiates, or where other fraudulent or overreaching conduct is shown.  In all such cases involving fraud in the procurement of the release the question is normally one for the jury. *Cf., Kirl* v. *Zinner,* 274 Mich 331 (majority [p 334]: "I cannot take the uncontradicted testimony relative to the release and  *  *  *  find evidence of fraud, mistake, duress, or unconscionable advantage taken."  Dissent [p 344]: "We think this question was for the jury.")  If the allegation of fraud is not proved the release, of course, is not impeached, *Perry* v. *Michigan Alkali Co.,* 150 Mich 537; *Powers* v. *Indiana & Michigan Electric Co., supra; Welch* v. *Citizens Mutual Automobile Ins. Co.,* 285 Mich 82; and obviously the same result obtains when "a release is pleaded, proved, and not attacked for fraud, duress, et cetera," *Erkiletian* v. *Devletian,* 299 Mich 95, 100.

The other of the dual requirements involves the matter of knowledge, the requirement with which we are here particularly concerned.  The cases put it very simply, and without dependence or reliance upon the language employed in the release or the form thereof: A releasor who believes he is without

personal injuries, or that he has certain minor injuries only, and who, secure in his belief, executes a general release, will not be bound by it if other and more serious injuries are discovered later. *Great Northern R. Co.* v. *Reid* (CCA), 245 F 86; *Pickering Lumber Co.* v. *Campbell,* 147 Okla 158 (295 P 596); *O'Meara* v. *Haiden,* 204 Cal 354 (268 P 334, 60 ALR 1381); *Nygard* v. *Minneapolis Street R. Co.,* 147 Minn 109 (179 NW 642); *Richardson* v. *Chicago, M. & St. P. R. Co.,* 157 Minn 474 (196 NW 643); *Simpson* v. *Omaha & C. B. Street R. Co.,* 107 Neb 779 (186 NW 1001); *Landau* v. *Hertz Drivurself Stations, Inc.,* 237 App Div 141 (260 NYS 561); *McIsaac* v. *McMurray,* 77 NH 466 (93 A 115, LRA 1916B, 769); *Ostergaard* v. *Adams & Kelly Co.,* 113 Neb 393 (203 NW 564); *Gold Hunter Mining & Smelting Co.* v. *Bowden* (CCA), 252 F 388; *Granger* v. *Chicago, M. & St. P. R. Co.,* 194 Wis 51 (215 NW 576); *Southwest Pump & Machinery Co.* v. *Jones* (CCA), 87 F2d 879. We recognize that these cases do not stand alone, that there is a minority of courts following the harsh rule that a release is binding regardless of resulting hardship. But the weight of authority, as well as of reason, accords with the rule as we have stated it, the principles of which are clearly involved in *Pawlicki* v. *Hollenbeck,* 250 Mich 38, relied on by the trial chancellor.

We would not be understood as holding (and here is exactly where many difficulties arise) that it is not within one's competence to say "I may have serious injuries I know nothing about. As to them I will take my chances." This, one may do. He may, if he wishes, release his rights and assume the risk of future disablement for $1 "and other good and valuable consideration," or $50, or, indeed, an old beaver hat. In other words, it is possible that a reasonable, intelligent person, in full possession of all his faculties, and with knowledge that he may

have serious injuries, will release a tort-feasor from all liability in return for a trifling sum of money. If such has in truth been the intention and the agreement, we will not disturb the parties. *Cf., Noble* v. *Farris* (CCA), 221 F2d 950. But although the judges, as Holmes put it, are "apt to be naif, simple-minded men" (Holmes, Collected Legal Papers, [1920], p 295), we will not be foreclosed in our inquiry by any form of release used. We will, in each case where fraud or mistake is alleged, look to the intent of the parties. (This is the orthodox phrasing. Actually, as the law of constructive conditions so well illustrates, those who link themselves together by contract assume a certain status with regard to each other, a status with respect to which the law itself imposes certain obligations.) As Williston puts it (5 Contracts [Rev ed], § 1551, pp 551, 552) "where a release is given by one injured in an accident and more serious injuries develop than were supposed to exist at the time of the settlement, it is a question of fact whether the parties assumed as a basis the release of the known injuries, or whether the intent was to make a compromise for whatever injuries from the accident might exist whether known or not."

On the other hand, the payment and the acceptance of a small sum for a serious injury may indicate that the parties were mistaken in their basic assumptions. The intent involved being a question of fact, we will observe, in its determination, among other pertinent factors bearing upon the issue, the haste, or lack thereof, with which the release was obtained, the sum of money involved as consideration, and all the circumstances surrounding the release, including, of course, the conduct and intelligence of both the releasor and the releasee. In the case before us it is significant that there was no discussion whatever of the nature or extent of injuries.

There was no bargaining with respect to them. The plaintiff says he knew of no injuries and bargained on that basis. It seems clear that Citizens' was likewise mistaken. Accordingly, we reject, as did the trial chancellor, the proposition that Citizens' intended to pay plaintiff the pittance of $50 in return for complete absolution of liability for any and all personal injuries, whatever their extent or gravity, and we likewise reject the corollary that the plaintiff understood he was accepting this trifling sum for the severe injuries which he claims he now suffers. He did not, in other words, sell, nor did Citizens' buy, either these injuries, or its peace, for $50. Upon these facts it is as clear to us as it was to the trial chancellor that plaintiff was bargaining at all times only "the question of compensation for damages to his automobile."

Affirmed. Costs to appellee.

EDWARDS and BLACK, JJ., concurred with SMITH, J.

DETHMERS, C. J., and SHARPE, KELLY, and CARR, JJ., concurred in the result.

VOELKER, J., took no part in the decision of this case.