845 F.2d 326
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jerome MILLER, Donald Ewers, Ferdinand Pfeifer, Individually
and as Representative of a class of individuals
similarly situated, Plaintiffs- Appellants,
v.
GENERAL MOTORS CORPORATION, a foreign corporation, Defendant-Appellee.
 No. 87-1493.
 United States Court of Appeals, Sixth Circuit.
 April 27, 1988.
 
 Before NATHANIEL R. JONES and RALPH B. GUY, Jr., Circuit Judges and CONTIE, Senior Circuit Judge.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Plaintiffs filed suit individually and as representatives of a class of workers who were transferred from the General Motors Corporation (GM) to Electronic Data Systems Corporation (EDS). In their complaint, plaintiffs allege that they were forced to accept a less generous employee benefits package as a result of their transfer to EDS, a wholly-owned subsidiary of defendant, GM. Plaintiffs brought claims for breach of contract, fraudulent misrepresentation, and breach of fiduciary obligation under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001, et seq. Defendant removed the case to federal court and filed a motion for summary judgment on the ground that plaintiffs had signed a release of all claims arising from their transfer from GM to EDS. The district court granted the defendant's motion for summary judgment with respect to three of the four plaintiffs, finding that they had signed a valid release discharging GM from all claims arising from transfer of the employee from GM to EDS. We agree and affirm.
 
 I.
 
 2
 The following facts as set forth in the district court's opinion are undisputed. On September 21, 1984, GM announced to its shareholders its intention to acquire EDS. On October 18, 1984, the acquisition of EDS was consummated following the approval of the proposal by the shareholders of GM. In November, 1984, GM employees involved in EDS activities were advised that effective January 1, 1985, they would be transferred to EDS. As a result, the former GM employees would no longer be active participants in the benefit plans of GM; however, they would retain their vested and accrued benefits under the GM plans and would be immediately eligible to participate in the EDS benefit program.
 
 
 3
 In February, 1985, the employees who were transferred from GM to EDS were offered an opportunity to participate in the stock incentive plan of EDS. Pursuant to the terms of the offer, employees were permitted to purchase not more than 1,000 shares of GM Class E common stock at the rate of ten cents per share. The stock purchase agreement included an express release of all claims against GM and EDS arising from the employees' transfer to EDS, including any claims for breach of contract:
 
 
 4
 Buyer's Release. In consideration of the grant and sale of shares of Class E stock pursuant to this Agreement, Buyer hereby releases and forever discharges GM and the Company [EDS], their officers, directors and employees from all claims, demands and causes of actions, known or unknown, which Buyer may have based upon or relating to his transfer under any state or federal law or regulation relating to employment and any claims for breach of employment contract, either express or implied. Buyer further agrees not to institute any proceeding, suit, action at law or in equity against GM, the Company [EDS] or their officers, directors, agents, employees, or stockholders, based on any of the matters covered by the release set forth above.
 
 
 5
 Restricted Stock Agreement p 6. The plaintiffs were presented with a copy of the stock agreement on February 25, 1985. They were required to respond by March 4, 1985. Three of the four plaintiffs in the instant action, Jerome Miller, Donald Ewers, and Ferdinand Pfeifer, elected to participate in the stock incentive program. The market value of these Class E shares was considerably higher than the purchase price at the time of the stock agreement; however, because of the various restrictions on the stock purchase, the shares vest at ten percent a year and will not be available for sale until the year 1997. Plaintiff Pfeifer paid $47 for 470 shares of GM Class E stock. According to defendant, the current value of those shares is approximately $45,000. Plaintiff Ewers paid $100 for 100 shares which are now worth approximately $96,000. Plaintiff Miller paid $78.50 for 785 shares with a current total value of over $75,000.
 
 
 6
 On August 16, 1985, Miller, Ewers, Pfeifer, and Kenneth Wittl filed suit against GM in state court claiming breach of contract, breach of obligation to provide severance pay, and fraudulent misrepresentation. Essentially, plaintiffs claim that, as employees of EDS, a wholly-owned subsidiary of defendant, GM, they were entitled to the identical benefits received by employees of GM. In its motion for summary judgment, the defendant submitted a memorandum which was provided to the plaintiffs prior to their transfer to EDS, outlining the differences between the benefit plans of EDS and GM. GM also attached the affidavits of the plaintiffs in which they acknowledged that: (1) each had the choice of transferring to EDS or accepting a special separation allowance of up to one-year's salary; (2) each plaintiff was furnished with documents on February 24, 1985, advising that a precondition of participation in the EDS incentive plan was the release of GM from all liability arising from the transfer of employment; and (3) each plaintiff had the option of accepting or declining participation in the EDS employee stock incentive plan. In response to GM's motion for summary judgment, plaintiffs argued that the release was not knowingly executed by them and it was given without consideration. They also claimed that the release was void under ERISA and was contrary to the terms of the EDS employees' stock incentive plan. In granting GM's motion for summary judgment, the district court found that the plaintiffs knew or should have known that their participation in the stock plan entailed the release of claims against GM. The court also found that the plaintiffs received ample consideration in the form of shares of Class E common stock which they were allowed to purchase at a nominal rate. Finally, the court concluded that the release operated to "insulate defendant" from any liability with respect to alleged violations of ERISA and the separation allowance plan.
 
 II.
 
 7
 On appeal, plaintiffs raise several arguments contesting the validity of the release which they signed barring any claims against GM arising from their transfer to EDS. We address each of the arguments seriatim.
 
 
 8
 Plaintiffs claim that the release was invalid under Michigan law because it was not "fairly and knowingly" made. In support of their argument, plaintiffs cite to the Michigan Supreme Court decision in Denton v. Utley, 350 Mich. 332, 86 N.W.2d 537 (1957). In Utley, the plaintiff had been involved in an automobile accident which resulted in significant damage to his car. The plaintiff sent a letter to the other driver's insurance company requesting that they reimburse him for the $50 deductible on his own collision insurance. On the back of the check which the insurance company sent to the plaintiff, a general release was printed purporting to discharge any and all claims arising from the accident. The plaintiff endorsed the check in the space provided below the general release. Subsequently, the plaintiff claimed to experience injuries which he attributed to the accident and filed suit for damages.
 
 
 9
 The Michigan Supreme Court held that the general release was invalid based on a mutual mistake of fact on the part of the parties to the release. The court found that the plaintiff was not aware of his latent injuries at the time he signed the check, and that he did not intend to extinguish all his claims for the "trifling sum" of $50. See 350 Mich. at 346. In general terms, the Michigan Supreme Court stated that, in order to be valid, a release must be "fairly and knowingly" made. As examples of unfairness, the court cited to cases wherein releases were found to be invalid because the party was "suffering from shock and dazed" at the time of the release, or because the party was under the influence of drugs, or where there was evidence of fraud, mistake, duress, or unconscionable advantage taken. Id. at 343. With respect to the knowledge requirement, the court stated, "A releaser who believes he is without personal injuries, or that he has certain minor injuries only, and who, secure in his belief, executes a general release, will not be bound by it if other and more serious injuries are discovered at a later period." Id. at 343-44 (citations omitted).
 
 
 10
 In the instant case, plaintiffs claim that the release was not "fairly and knowingly" made since they were not given adequate time to consider the effects of the "general, boiler plate release." This argument is without merit. According to the admissions in their affidavits, plaintiffs had over a week to consider the terms of the release which were contained in the stock purchase agreement. Moreover, contrary to the plaintiffs' characterization of the "general boiler plate" language of the release, we find that the language is clear and unambiguous and specifically informed plaintiffs that they were waiving all claims arising from their transfer to EDS by signing the stock agreement which included the release.
 
 
 11
 Plaintiffs also argue that the release is invalid because it was not supported by adequate consideration. This argument is unpersuasive. Plaintiffs quote from the first paragraph of the EDS stock incentive plan which states in part:
 
 
 12
 The purpose of the plan is to provide corporate officers and key employees of [EDS] and its subsidiaries ... with a strong incentive for individual creativity and contribution to insure the future growth of the company. The plan is not designed to benefit persons who may be satisified solely with past accomplishments, but, rather, it is designed to reward those who are deeply committed to a career with the company [EDS] and whose ability and diligence permits such persons to make important contributions to the success of the company by enabling such persons to acquire shares of Class E common stock ... in the manner contemplated by the plan.
 
 
 13
 Plaintiffs also quote from the introductory page of the restricted stock agreement which provides in part:
 
 
 14
 In recognition of your prior valuable service and experience with [GM] and your importance to the success of the new alliance between [EDS] and GM, the 1984 stock incentive plan committee has approved a special recognition grant to you pursuant to the 1984 [EDS] stock incentive plan.
 
 
 15
 Relying on these generalized statements, plaintiffs argue that the stocks they received pursuant to the restricted stock agreement were in exchange for their past services at GM and the future services which they will perform for EDS and, therefore, were not in exchange for the release which was contained in the agreement. We disagree. The release which is contained in the restricted stock agreement specifically provides, "in consideration of the grant and sale of shares of Class E stock pursuant to this agreement, buyer hereby releases and forever discharges GM and the company...." This language explicitly states that the shares of Class E stock which the plaintiffs received pursuant to the restrictive agreement were given in consideration for their release of potential claims against GM and EDS arising from their transfers. Moreover, plaintiffs admit that "the market value of these shares is considerably higher than the purchase price." (Plaintiffs' brief at 5). Thus, it is obvious that the consideration given in exchange for the releases in this case is substantially more than the "pittance" or "trifling amount" involved in Denton v. Utley.
 
 
 16
 Plaintiffs also attempt to argue that the release is void as against public policy because it purports to limit their statutory rights under ERISA. Specifically, plaintiffs cite to section 410(a) of ERISA which provides in part:
 
 
 17
 [A]ny provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability from any responsibility, obligation, or duty under this part shall be void as against public policy.
 
 
 18
 29 U.S.C. Sec. 1110. Plaintiffs' reliance on this section is misplaced. Section 410(a) is contained in Part IV which pertains to fiduciary duties owed by trustees and administrators to the plan. See 29 U.S.C. Sec. 1109. Thus, section 410 of ERISA was enacted to preclude a fiduciary from being reimbursed from the employee benefit trust funds for a personal loss incurred by the trustee or administrator as a result of a breach of fiduciary duty. This section does not prohibit an employer from obtaining a release from employees in consideration of a grant of stock.
 
 
 19
 Finally, plaintiffs argue that the district court was premature in granting the defendant's motion for summary judgment because plaintiffs had not completed their pretrial discovery. The information sought by the plaintiffs, however, does not relate to the issue of the release which is the determinative issue in this case. Given the undisputed evidence in the record, including the affidavits of the plaintiffs themselves, we find that the defendant was entitled to judgment as a matter of law based on the written releases signed by the plaintiffs. Accordingly, the judgment of the district court below is AFFIRMED.
 
 
 20
 CONTIE, Senior Circuit Judge, dissenting.
 
 
 21
 The majority fails to consider appellants' argument that the Supreme Court's decision in Brooklyn Savings Bank v. O'Neil, 324 U.S. 697 (1945), and this court's decision in Runyan v. National Cash Register Corp., 787 F.2d 1039 (6th Cir.), cert. denied, 107 S.Ct. 178 (1986), support the finding of a public policy exception to the defense of release which is grounded in case law. I am persuaded by this argument that, similar to the Fair Labor Standards Act (FLSA) and the Age Discrimination in Employment Act (ADEA), the Employee Retirement Income Security Act (ERISA) is protective legislation whose purpose cannot be furthered if we recognize the defense of release in this case. Accordingly, I dissent.
 
 
 22
 In O'Neil, the Supreme Court held that the respondent's release of all claims and damages under the FLSA, given at the time he received payment of overtime compensation due under the FLSA, was not a defense to an action subsequently brought solely to recover liquidated damages. The Supreme Court reasoned that
 
 
 23
 a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy.... Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate.... [T]he question of whether the statutory right may be waived depends upon the intention of Congress as manifested in the particular statute....
 
 
 24
 ... In the absence of evidence of specific Congressional intent, it becomes necessary to resort to a broader consideration of the legislative policy behind this provision as evidenced by its legislative history and the provisions in and structure of the Act.
 
 
 25
 Id. at 704-06 (citations and footnote omitted).
 
 
 26
 The Supreme Court went on to hold that the legislative history of the FLSA "shows an intent on the part of Congress to protect certain groups of the population from sub-standard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce." Id. at 706. The Court concluded that the same policy considerations which prohibit waiver of basic minimum and overtime wages under the FLSA[1] likewise prohibit waiver of the employees' right to liquidated damages. Id. at 707.
 
 
 27
 Shortly thereafter, in D.H. Schulte, Inc. v. Gangi, 328 U.S. 108 (1946), the Supreme Court extended its holding in O'Neil. In Gangi, the Court held that the purpose of the FLSA requires that the remedy of liquidated damages under the FLSA cannot be bargained away by bona fide settlements of disputes over coverage of the Act. Gangi, 328 U.S. at 114-18.
 
 
 28
 More recently, in Runyan, this court was willing to extend the rationale enunciated in O'Neil to waivers under the ADEA. The ADEA incorporates the enforcement provisions of the FLSA. In Runyan, the court decided that under particular circumstances, for example a bona fide factual dispute between the parties--a circumstance not involved in O'Neil or Gangi, employers and employees may negotiate a valid release of ADEA claims. Id. at 1044. The court, however, went on to state: "We recognize, however, that in accord with the concerns expressed in O'Neil and Gangi courts should not allow employers to compromise the underlying policies of the ADEA by taking advantage of a superior bargaining position or by overreaching." Id. at 1044-45.
 
 
 29
 Unlike the ADEA, ERISA does not incorporate the enforcement provisions of the FLSA. ERISA does, however, have a similar policy of protecting employees. The Supreme Court has recently acknowledged this policy in Pilot Life Insurance Company v. Dedeaux, 107 S.Ct. 1549, 1551 (1987):
 
 
 30
 In ERISA, Congress set out to 'protect ... participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.' Sec. 2, as set forth in 29 U.S.C. Sec. 1001(b).
 
 
 31
 Because Congress' express policy in enacting ERISA is to protect participants in employee benefit plans and their beneficiaries, I would hold that, similar to release under the FLSA and ADEA, release of rights under ERISA is limited to particular circumstances such as when the case is limited to a bona fide factual dispute between the parties. As in Gangi, the release in the instant case is best described as the settlement of a dispute over coverage of the Act. Therefore, the release should be held invalid.
 
 
 32
 For the foregoing reasons, I dissent.
 
 
 
 [1]
 The Court did not cite authority for the proposition that waiver of basic minimum and overtime wages is forbidden, it simply stated that the parties did not argue otherwise