HELEN M. BERNSTEIN ET AL. *v.* DEAN RAUM KAPNECK ET AL.

[No. 1302, September Term, 1979.]

*Decided July 11, 1980.*

The cause was argued before MOYLAN, MOORE and LISS, JJ.

*Morris Kletzkin,* with whom were *Gerald Herz* and *Friedlander, Misler, Friedlander, Sloan & Herz* on the brief, for appellants.

*Thomas H. Talbott,* with whom were *Brault, Graham, Scott & Brault* on the brief, for appellees.

LISS, J., delivered the opinion of the Court.

Helen M. Bernstein, individually, and as mother of Irene Andrea Bernstein and Deborah Bernstein, infant plaintiffs, and Edwin S. Bernstein, stepfather of the infants, and husband of Helen M. Bernstein, are the appellants in this case. Mrs. Bernstein was the nominal plaintiff in a suit at law filed in the Circuit Court for Montgomery County in which it was alleged that the infant children sustained personal injuries arising out of the negligence of the defendants, Dean Raum Kapneck, Barbara Sue Sussman, Katherine Gray Munroe and Pat Munroe, the appellees herein.

On March 2, 1978, the parents of the minor children and defendant Sussman filed a settlement agreement with the lower court. By order dated March 2, 1978, the court entered judgments in favor of the minors, Irene Andrea Bernstein and Deborah Bernstein against the defendant Barbara Sue Sussman in the amount of $7,500. and $750., respectively. On the same date Helen M. Bernstein, individually, and as mother and next friend, executed an indemnifying release which was as follows:

> FOR THE SOLE CONSIDERATION of Seven Thousand Five Hundred and 00/100 ($7,500.00), the receipt and sufficiency whereof is hereby acknowledged, the undersigned, Helen M. Bernstein, individually and as parent and natural guardian of Irene Schulman [Bernstein], a minor, hereby releases and forever discharges Barbara Sue Sussman and Government Employees Insurance Company , their heirs, executors, administrators, agents and assigns, and all other persons, firms or corporations liable for or who might claim to be liable, hereinafter called Releasees, none of whom admit liability but all expressly deny any liability, from any and all claims, demands, damages, actions causes of action, or suits of whatsoever kind or nature, and particularly on account of loss or damage to the property and on account of bodily

injuries, known and unknown, and which have resulted or may in future develop, sustained by Irene Schulman [Bernstein], a minor, born on 3/25/70, or arising out of damage or loss direct or indirect sustained by the undersigned in consequence of an accident involving the automobile accident occurring on or about July 25, 1975, at or near Persimmon Tree Road at or near the intersection of Bradley Boulevard in Bethesda, Maryland

As further consideration for the payment of said sum, the undersigned hereby agrees to protect the said Releasees against any claim for damages, compensation or otherwise, on the part of said minor or any other party, growing out of or resulting from injury to said minor in connection with the above mentioned accident, and to reimburse or make good any loss or damage or costs that the said Releasees may have to pay if any litigation arises from said injuries; and the undersigned hereby waives any and all rights of exemption, both as to real and personal property, to which the undersigned may be entitled under the laws of this or any other state as against such claims for reimbursement or indemnity by the said Releasees.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 2nd day of March, 1978.

> X Helen M. Bernstein        (SEAL)
> Helen M. Bernstein, Individually
> and as Mother and Next Friend of
> Irene Schulman

On February 13, 1979, the appellants filed a petition for reconsideration, revision, declaratory and other relief with respect to the judgment rendered as to the minor, Irene Andrea Bernstein. An evidentiary hearing on the petition was held on July 9, 1979, after which the lower court took the matter under advisement.

On September 27, 1979, the petition for reconsideration, revision, declaratory and other relief was denied by order and opinion of the court. It is from that order that this appeal was filed.

Appellant states the issues to be decided by this appeal as follows:

> I. Does the revisory power of a court in a case of "mistake" under Maryland Rule 625 a include the power to set aside a release and settlement agreement on the ground of mutual mistake?
>
> II. Does the law of the State of Maryland allow a release and settlement agreement entered into on behalf of a minor to be set aside on the ground of mutual mistake where the parties did not intend to settle with respect to unknown injuries?

On July 25, 1975, the minor children were passengers in a motor vehicle which was involved in an accident in Montgomery County. A settlement agreement among the parties was reached on March 2, 1978, and on that date counsel and appellant, Helen M. Bernstein, appeared before the Hon. John F. McAuliffe to seek approval of the settlement made on behalf of the minor children. After reviewing the medical reports furnished by counsel and discussing the case with the mother and her attorney, the judge entered a written order, approved the settlement and entered judgments as agreed among the parties. On March 6, 1978, plaintiffs' counsel filed a *praecipe* entering all judgments paid and satisfied and also filed *praecipe* marking all remaining claims of the plaintiffs in the case as against all defendants settled and dismissed with prejudice. The indemnifying release was executed by Mrs. Bernstein on March 2, 1978.

More than eleven months later, Helen M. Bernstein, individually and on behalf of Irene Andrea Schulman [Bernstein] filed with Edwin S. Bernstein, stepfather of the children, the petition which is the subject matter of this appeal. By that petition she sought to set aside the settlement release and judgments entered on March 2, 1978

on the ground that the release was entered into, executed and delivered as a result of a mutual mistake of fact.

Judge McAuliffe, in an excellent synopsis of the facts as they were known to the parties and to the trial judge at the time of settlement and the entry of the judgments, stated the factual summary as follows:

1. Irene was riding as an unbelted passenger in the rear seat of a motor vehicle when a collision caused her to be thrown against the rear portion of the seat in front of her, causing the following apparent injuries:

a. Severe laceration of the face, described by the treating doctor as an "extensive, deep, irregular laceration of the forehead which extended from the glabella area down across the nose with exposure of the nasal bones and the cartilaginous framework of the nose."

b. Chip fracture of the nasal bones.

c. Non-displaced fracture of the scapula (right shoulder).

d. Moderately severe traumatic neurosis.

2. Irene was five years of age at the time of the accident.

The laceration was surgically repaired under local anesthesia by a plastic surgeon, who at the same time repaired the chip fracture of the nasal bones. By his report of September 13, 1976, the plastic surgeon indicated the probable need for later revision of the scar, and stated there would result some permanent scarring notwithstanding the revision. Anticipated surgical costs for revision were $300 to $400, with a period of hospitalization of one to two days for each procedure (revision and/or dermabrasion).

The non-displaced fracture of the right scapula was treated with a simple sling, and healed completely with no residuals.

Irene was also seen by the chief of the Ophthalmology Service of Georgetown University Hospital five days after the accident, because her mother had noted the eyes crossing for one or two days after the lids were swollen. The ophthalmologist reported no ocular involvement.

The most significant concern of the mother and stepfather following resolution of the immediate observable physical defects caused by the accident involved emotional sequelae. As a result of this concern, Irene was seen for psychiatric evaluation by Dr. Joel Ganz in or about January of 1977. Dr. Ganz was of the opinion that Irene (and her sister) were in need of therapy, and that the automobile accident was a direct causative factor, superimposed upon pre-existing conditions. The projected cost for therapy for both children and both parents (in the opinion of Dr. Ganz) was some $9,360 per year, for about two years. Irene was next seen by Dr. Sidney Berman, who reported on March 28, 1977 that he had made "a psychiatric and neurological diagnostic study . . ." of Irene. He felt Irene then suffered from a moderately severe traumatic neurosis due to "a severe injury she received as a result of an automobile accident in July of 1975." He recommended psychotherapy over a period of six to twelve months. In his report of December 14, 1977 to the attorney then representing the plaintiffs, Dr. Berman provided some additional details of the manifestations of this diagnosed neurosis, and estimated the probable cost of necessary psychotherapy to be $4,000 to $5,300, plus transportation.

At the hearing on plaintiffs' motion to vacate the judgment and to invalidate the release, additional uncontradicted evidence was offered which established that:

Irene also suffered physical damage to the brain as a result of this accident, resulting in

post-traumatic seizure disorder. This diagnosis was made as a result of an electroencephalogram performed on or about October 4, 1978, and additional history elicited by Dr. Stanley Cohan from the mother and stepfather, and of course from physical and neurological testing. According to the testimony of Dr. Cohan, it was within reasonable medical probability that an electroencephalogram taken immediately after the accident would have disclosed some abnormality as a result of this injury, and an electroencephalogram taken at any time after six months following the accident would have probably demonstrated spiking, and would otherwise have been indicative of the serious nature of the brain injury. Dr. Cohan was of the opinion that he will probably be able to control Irene's seizure disorder, but she will undoubtedly be under the care of physicians for her seizures for the rest of her life. In addition, he stated that her impairment in reading and eye-hand coordination, as well as the social embarrassment caused by motor incoordination are likely to be lifelong problems, and that additional expenses will be required for special education.

Plaintiffs contended below and here contend that all parties including the judge were unaware that Irene had suffered brain damage as a result of the accident and that the parties, therefore, acted upon a material and mutual mistake of fact which requires that the plaintiff be granted the relief prayed. The trial judge found clear and convincing proof that Irene had in fact suffered the brain damage complained of and that the damage existed at the time of the settlement and judgment. He further found, as a fact, that Irene's mother and stepfather had exercised reasonable diligence in attempting to ascertain the full nature and extent of Irene's injuries prior to entering into the settlement, and that the amount of the settlement would not have been found to be reasonable by the parties or the court

if the additional element of a serious brain injury had been known.

In spite of these findings, the trial judge did *not* find the existence of a mutual mistake of fact sufficient to justify the judicial rescission of the contract of release in this case.

We find this case in a somewhat confusing posture. Appellants filed their petition originally at law in an effort to have the court exercise its revisory power under Maryland Rule 625 a which was the sole authority cited to support appellants' position at that point. At some juncture in the proceedings, the character of the case changed to an equitable proceeding in which the appellants sought the rescission of the contract of release on the equitable ground of mutual mistake.[1] Although the case was not transferred to equity, it was argued on equitable grounds before the lower court without objection by either side and was briefed and argued before us by both parties on the same basis. The lower court decided the case based on Rule 625 a and the equitable claim for rescission. We shall follow suit.

## I.

It must be emphasized that the judgment here involved was enrolled at the expiration of thirty days from its original entry on March 2, 1978. Appellants concede that they did not begin their proceeding to set aside the judgment until long after that thirty day period had elapsed. They urge, however, that under statutory law as codified in the Annotated Code of Maryland, Courts and Judicial Proceedings Article, Sec. 6-408 (1974, 1979 Cum. Supp.), and Rule 625 a, the court has revisory power and control over the judgment beyond the thirty day period in the event of fraud,

---

1. It should be noted that equity, from its inception, has had jurisdiction to concern itself with mistakes. 3 Pomeroy, Equity Jurisprudence, Sec. 838. In addition, the equitable remedy of cancellation or rescission of contracts and other instruments has long been available as a method of granting relief from the consequences of any mistake of fact which is a material element of the transaction. *See* Restatement, Contracts, Sec. 502; Restatement, Torts, Sec. 900. Further, the spirit of equity is given great emphasis in the application of the rule that a release may be avoided where it can be shown that there was a mutual mistake. *See* Sloan v. Standard Oil Co., 177 Oh. St. 149, 203 N.E.2d 237 (1964).

mistake, or irregularity. The language is the same in the rule and the statute except that the statute adds the language "or failure of an employee of the court or the clerk's office to perform a duty required by statute or rule." That additional language has no relevance to the case at bar.

Appellant concedes that in the reported cases from the Court of Appeals and this Court the meaning of "mistake" as used in Rule 625 a has not been clearly defined. However, it is clear to us that in those cases permitting a judgment to be set aside on the basis of "mistake," the mistake must necessarily be confined to those instances where there is a jurisdictional mistake involved.

In *Hughes v. Beltway Homes, Inc.,* 276 Md. 382, 347 A.2d 837 (1975), the Court of Appeals interpreted "mistake" as follows:

> The type of situation in which mistake might be applicable is demonstrated by *Miles v. Hamilton,* 269 Md. 708, 309 A.2d 631 (1973) (no valid service of process) and *Ashe v. Spears,* 263 Md. 622, 284 A.2d 207 (1971), *cert. denied,* 406 U.S. 958 (1972), (a contention of no valid service of process). It is further demonstrated by two cases arising before adoption of Rule 625, *Harvey v. Slacum,* 181 Md. 206, 210-11; 29 A.2d 276 (1942), (default judgment entered where there has been no valid service of process), and *May v. Wolvington,* 69 Md. 117, 14 A. 706 (1888), (judgment by default entered for lack of a plea when appropriate pleadings had in fact been filed). [276 Md. at 387.]

The Court indicated that these jurisdictional mistakes could justify the utilization of the Court's revisory power over an enrolled judgment. The Court also noted that it had in various opinions seemed to have equated the term "mistake" with "irregularity." However, it cited a number of cases to which the term mistake was not applicable to an enrolled judgment where there had been an effort to strike. The Court stated that Rule 625 was:

> not applicable to an enrolled decree in a mechanics'

lien foreclosure case, making reference to the wrong lot, *Brunecz v. DiLeo,* 263 Md. 481, 483, 283 A.2d 606 (1971); to a mistaken belief of out-of-state counsel the Maryland procedure relative to attachment was similar to that in his state, which brought about a judgment by default, *Penn Central Co. v. Buffalo Spring,* 260 Md. 576, 581, 273 A.2d 97 (1971); to the negligence or mistake of the agents and counsel of a complaining party, *Wooddy v. Wooddy,* 256 Md. 440, 453, 261 A.2d 486 (1970); to failure to attach a ledger card to an affidavit with a motion for summary judgment or the failure of counsel to file an appropriate pleading prior to the expiration of the time specified by rule, *Household Fin. Corp. v. Taylor,* 254 Md. 349, 356, 254 A.2d 687 (1969); to a finding that a judgment by default was based upon vouchers, some of which were in the name of the defendant, some in the name of a corporation, and some in the name of another person, *Berwyn Fuel & Feed Co. v. Kolb,* 249 Md. 475, 478-79, 240 A.2d 239 (1968); to a mistaken determination that summary judgment· should be entered against a defendant, *Rhodes Co. v. Blue Ridge Co.,* 218 Md. 329, 331, 146 A.2d 771 (1958); or to a failure by parties defendant to inform their attorneys of the defenses that they had, *Thomas v. Hopkins,* 209 Md. 321, 326-27, 121 A.2d 192 (1956). [276 Md. at 386-87.]

Appellants urge that Rule 625 a applies here because there was a mutual mistake as to the nature of the minor's injuries. We do not agree. We find no mistake as contemplated under Rule 625 a which would justify striking the enrolled judgment.

## II.

Appellants urge we find that the trial court erred in its refusal to declare the release and settlement agreement executed by the parties to be null and void. They contend

that the parties to the release as well as the trial court were mutually mistaken as to the physical, medical and neurological condition of the minor at the time the release and agreement were executed and approved.

The law is clear that a compromise agreement or release is a contract and is governed by the law of contracts. 15A Am. Jur. 2d *Compromise and Settlement* Sec. 7 (1976); 66 Am. Jur. 2d *Release* Sec. 1 (1973); *Mangini v. McClurg*, 24 N.Y.S.2d 556, 249 N.E.2d 386 (1969). It is equally clear that "a contract may be voided on the ground of mutual mistake of fact where the mistake is common to both parties and by reason of it each has done what neither intended." 17 Am. Jur. 2d *Contracts* Sec. 143 (1964). In order for a mistake of fact to affect the legal effect of a compromise agreement, "it must be such that it animated and controlled the conduct of the party." 54 Am. Jur. 2d *Mistake, Accident or Surprise* Sec. 5 (1971).

We note that a distinction must be made initially between a mutual mistake as to the existence of an *unknown injury* and a mistake as to the *unknown consequences of a known injury*. As to a settlement and compromise of the latter the parties are said to have assumed the risk regarding any uncertainties as to these known injuries. In this situation, the existence of the known injuries are consciously considered by both parties in reaching their compromise agreement. Thus, where recovery takes longer than expected no "mistake" is present sufficient to invalidate the agreement. When, however, the injury was unknown to the parties but is discovered to have existed at the time of settlement, the injury cannot be said to have been taken into account by the parties in reaching their compromise agreement as only the injuries then known to the parties would have been considered. In such a case where the parties are mutually mistaken as to a fact material to the agreement, they cannot be said to have assumed the risk of their being mistaken with regard to the consequences of an injury of which they had no knowledge. 15A Am. Jur. 2d *Compromise and Settlement* Sec. 33 (1976). *See Grand*

*Trunk Western R. Co. v. Lahiff,* 218 Wis. 457, 261 N.W. 11 (1935).

Another requisite for the avoidance of a release premised on mutual mistake is clear and convincing proof that the party seeking to set aside the compromise agreement has exercised reasonable diligence in attempting to ascertain the extent of the injuries prior to entering into the settlement. The facts of this case show that more than two years elapsed from the date of the accident until suit was filed; that the settlement agreement was not entered into until nearly three years after the accident; that the minor child was seen or treated by a plastic surgeon, an ophthalmologist, a radiologist, an orthopedic surgeon, two psychological testing services and two psychiatrists, none of whom found any evidence of brain damage. It was on the basis of these facts that the trial judge found that the parents of the minor child exercised reasonable diligence in ascertaining the full nature and extent of the child's injuries before entering into the settlement. The trial court, in the case at bar, summarized the injuries to the minor child known to the parties at the time of the execution of the release; however, the brain injury resulting in traumatic epilepsy was not included in those known injuries. The trial court further found that there was clear and convincing evidence that the seizure disorder existed at the time of settlement and was the result of the accident. The trial judge refused, however, to consider whether the seizure disorder suffered by the child was an unknown injury or the unknown consequence of a known injury.

The trial court was correct in its conclusion that there are no Maryland decisions directly apposite to the present case. We also think the court was correct in its conclusion that the majority of jurisdictions that have considered the avoidance of a release under similar circumstances would have afforded the appellants the relief requested.

In *Ricketts v. Pennsylvania R. Co.,* 153 F.2d 757, 767 (2d Cir. 1946), in a special concurring opinion, Judge Frank said: "In all likelihood, it is because the courts have sensed the differentiated character of releases of personal injury

claims that the 'modern trend,' as Wigmore describes it, 'is to * * * develop a special doctrine * * * for that class of cases, liberally relieving the party who signed the release." Wigmore, Evidence, Sec. 2416. *See also Clancy v. Pacenti,* 15 Ill. App. 2d 171, 145 N.E.2d 802, 805 (1957).

In *LeFrancois v. Hobart College,* 31 N.Y.S.2d 200, 39 N.E.2d 271 (1941), the injury known to have been sustained by the plaintiff was found by the court to have been a brain concussion. Settlement was made after the symptoms of the concussion had subsided. Subsequently, it was discovered the plaintiff had sustained a brain injury so severe that he developed permanent paralysis of his right side. In response to the contention by the defendant that the plaintiff, having suffered a concussion, must necessarily have known he suffered a brain injury, the court said that:

> The two terms are not entirely synonymous as a matter of practical application, especially from the point of view of a layman . . . . [T]he question here is whether the plaintiff, a layman, knew about his injury, and not what the opinion of highly specialized physicians may have been. The Courts should attempt to solve pragmatically problems of this character. [31 N.Y.S.2d at 203-04.]

In *Hall v. Strom Construction Co.,* 368 Mich. 253, 118 N.W.2d 281 (1962), a case in which the injury was identical to the case at bar, the court said:

> To make the rule pinpoint plain, we construe it as applicable where the releasor's proof persuasively shows a fair and mutual want of knowledge of a hidden injury which eventually comes to light, distinguished from a then want of knowledge of unexpected adverse consequences of a known yet apparently negligible injury. Here, by all fair intendment, [plaintiff] and [defendant's insurer] knew that [plaintiff] had been struck injuriously on the head and back. They did not know of the simultaneous internal injury, that is, the brain

injury which upon present assumption was serious enough to cause the epileptic seizures [plaintiff] experienced later. The rule [allowing avoidance of a release where an injury was mutually unknown at time of release] therefore applies. [118 N.W.2d at 284.]

Appellees contend the language of the release is clear and unambiguous and is controlling in this case. They cite *Thomas v. Erie Ins. Exchange,* 229 Md. 332, 340, 182 A.2d 823 (1962), in which the Court of Appeals construed a release similar to the release in this case. In *Thomas,* the claimant contended that while she signed a release of all claims, her intention was to release only her claim under the liability section of an insurance policy and not her claims under the medical payments section. No reservation was made in the release agreement preserving her claim under the medical payment section of the policy. The Court stated: "We hold that the release here involved was plain, unambiguous and by its broad terms barred all subsequent claims theretofore existing between the contracting parties . . . ."

Maryland has adopted the objective test for the interpretation of contracts. In *Board of Trustees of State Colleges v. Sherman,* 280 Md. 373, 380, 373 A.2d 626 (1977), the test was explicated as follows:

[T]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended to mean; where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed; and when the language of a contract is clear, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

Again, in *Ray v. Eurice,* 201 Md. 115, 93 A.2d 272 (1952), the Court of Appeals said: "Finally, where there has been an

integration of an agreement, those who execute it will not be allowed to place their own interpretation on what it means or was intended to mean. The test in such case is objective and not subjective." *Also see Pemrock, Inc. v. Essco Co.,* 252 Md. 374, 249 A.2d 711 (1969); *Class v. Doctor's Hospital, Inc.,* 213 Md. 44, 131 A.2d 254 (1957).

In 13 Williston, *Contracts,* Sec. 1551 at 196, the author deals specifically with the majority view which approves the setting aside of releases for essentially subjective reasons and those jurisdictions which adhere to the objective test rule. He states:

> Of course, when parties settle for unknown injuries received in an accident, the release obtained is incontestable. But the cases where they deliberately undertake so to do must be rare.

> But even with this growing liberal trend in setting aside releases for essentially subjective reasons, and there are often cogent and compelling reasons for so doing, a substantial number of Courts adhere to the orthodox objective rule that absent mutual mistake, fraud, deceit or duress an unambiguous, all-inclusive, totally embracive release must be given effect as written.

*Williston* further states, in citing *Pemrock, Inc. v. Essco Co., supra,* that:

> The Court must construe an instrument according to its plain meaning and legal effect and will not be diverted from this course by self-serving declarations of the interested parties that conflict with the object and clear meaning of the document. The proviso that the instrument in question is not a release and that the right to recover for the same injury against the wrongdoer remains unimpaired are nugatory because repugnant to the primary meaning and legal effect and operation of the instrument itself. [*Id.* at 198.]

*Williston* also refers to *Emery v. Mackiewicz,* 429 Pa. 322, 240 A.2d 68 (1968), in which a release similar to the release in this case was discussed by the court:

> If such a release can be nullified or circumvented, then every written release and every written contract or agreement of any kind, no matter how clear and pertinent and all-inclusive can be set aside whenever one of the parties has a change of mind or whenever there subsequently occurs a change of circumstances which are unforeseen or there were after-discovered injuries or the magnitude of the releasor's injuries are unexpectedly increased, or plaintiff made an inadequate settlement. It would make a mockery of the English language and of the Law to permit this release to be circumvented or held to be nugatory. [240 A.2d at 70.]

Appellants asseverate that the language of the release in this case does not vitiate the mutual mistake which was sufficient to permit a showing of a lack of intent to settle for unknown injuries. They base their assertion on a number of cases which have so held including *Mangini v. McClurg, supra,* where it is stated:

> . . . [A] realistic recognition that releases contain standardized, even ritualistic, language and are given in circumstances where the parties are sometimes looking no further than the precise matter in dispute that is being settled. [T]he literal language should not be determinative of the ultimate result or be applied mechanically. [249 N.E.2d at 389-90.]

In *Aronovitch v. Levy,* 238 Minn. 237, 56 N.W.2d 570, 576 (1953), the Supreme Court of Minnesota stated:

> We perceive the rule in this state to be that, where the parties contract for a release of all claims for known injuries, the release is a bar to recovery for unknown consequences of known injuries but is

not a bar to recovery for unknown injuries not within the contemplation of the parties at the time of contracting for such release. Further that, even though a release expressly covers unknown injuries, it is not a bar to an action for such unknown injuries if it can be shown that such unknown injuries were not within the contemplation of the parties when the settlement was agreed upon, but that, if the parties did in fact intentionally agree upon a settlement for unknown injuries, such release will be binding. Whether the parties intended the release to cover unknown injuries is usually a question of fact.

The Appellate Court of Illinois said in *Florkiewicz v. Gonzalez,* 38 Ill. App. 3d 115, 347 N.E.2d 401, 405 (1976):

The courts in Illinois have refused to permit any form of words, no matter how all-encompassing, to foreclose scrutiny of a release and the attendant circumstances to be sure that it was fairly made and accurately reflected the intentions of the parties. [Citation omitted.] The trend is to set aside releases of personal injury claims in a situation where the facts, when finally known, present an unconscionable result.

Appellants urge this Court to adopt the majority rule and to hold that the trial court erred in refusing to rescind the release and settlement agreement between the parties on the ground of mutual mistake. Appellees just as vigorously suggest that the prior decisions in this State clearly indicate that Maryland has followed and would continue to follow the minority objective rule requiring that in the absence of proof of fraud an unambiguous release must be given effect as written.

This is a matter of first impression in Maryland so far as we have been able to determine, and we have stated the issue rather fully. However, because of the posture of this case, we find ourselves unable to decide the issue as raised.

We conclude we must distinguish between the cases cited by the appellant and the case at bar. So far as we have been able to determine, none of the cases which have been cited by appellant in support of the subjective majority rule as to the rescission of a release have involved an enrolled judgment. As we perceive the status of this case, even if, *arguendo,* we adopted the appellant's position, the most we could do would be to rescind the release and settlement agreement. We would still be left with a judgment which was enrolled for eleven months before this proceeding began. That judgment was entered, settled and satisfied, and the consideration paid and for all intents and purposes the case was finally closed almost a year before appellants filed their action. As we have held that the trial court had no power to strike the enrolled judgment under Rule 625 a, the remaining contentions of the parties are moot and their resolution must await another day.

*Judgment affirmed.*
*Costs to be paid by appellants.*