## HELEN M. BERNSTEIN ET AL. *v.* DEAN RAUM KAPNECK ET AL.

[No. 77, September Term, 1980.]

*Decided June 10, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Morris Kletzkin,* with whom were *Gerald Herz* and *Friedlander, Misler, Friedlander, Sloan & Herz* and *Edwin S. Bernstein* on the brief, for appellants.

*Thomas H. Talbott,* with whom were *Janet S. Zigler* and *Brault, Graham, Scott & Brault* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court. DAVIDSON, J., concurs in the result and filed a concurring opinion at page 465 *infra.*

Succinctly put, this appeal presents the issue whether a straightforward release of all claims for personal injuries, untainted by unconscionable conduct on the part of the releasee, may be avoided by the releasor when it later appears that unknown wounds existed at the time the document was executed; and, assuming that it may, the further issue arises whether an enrolled consent judgment springing from the release may be stricken under Maryland Rule 625 a as mistakenly entered, so as to form no block to the pursuit of additional monetary relief for the later revealed hurt.

On July 25, 1975, petitioner Irene Schulman, at the time a five year old infant, sustained substantial injuries in a two-car accident in Bethesda, Maryland, when the vehicle in which she was a passenger collided with one owned by respondent Barbara Sue Sussman and operated by respondent Dean Raum Kapneck. For a period of at least a year following the collision, Irene was thought by both her doctors and her parents to have suffered only these multiple injuries in the accident: (i) a severe hurt to the face, described by her doctor as an "extensive deep irregular lacera-

tion of the forehead which extended from the glabella area down across the nose," (ii) chip fractures of the nasal bones, (iii) a non-displaced fracture of the right shoulder, and (iv) a moderately severe traumatic neurosis.

Acting with the advice of competent counsel and based primarily on the medical diagnosis by and prognosis of the infant's doctors, Irene's mother (as she was authorized to do by Maryland Code (1974, 1980 Repl. Vol.), Courts and Judicial Proceedings Article, section 6-405) settled for $7500.00 the suit pending with regard to the claims she and her daughter possessed against the respondents resulting from the accident. To effectuate this understanding a release was executed by the mother, both individually and on behalf of her infant daughter, on March 2, 1978. In addition, on that same day, upon request of all the parties, a consent judgment in the agreed upon amount was entered by direction of Judge John F. McAuliffe in the damage action which had been instituted in the Circuit Court for Montgomery County on August 22, 1977.[1]

The release purchased by the respondents which formed the basis for the simultaneous entry of the agreed to judgment, reads in pertinent part:

> For the sole consideration of Seven Thousand Five Hundred Dollars ... Helen M. Bernstein, individually and as parent and natural guardian of Irene Schulman, a minor, hereby releases and forever discharges Barbara Sue Sussman and Government Employees Insurance Company ... and all other persons, firms or corporations liable for or who might claim to be liable, ... from any and all claims, demands, damages, actions, causes of action, or suits of whatsoever kind or nature, and particularly on account of loss or damage to the property and *on account of bodily injuries, known*

---

1. A line by the plaintiffs noting the judgment as being "paid fully and satisfied," as well as one directing that the remaining claims against all defendants be marked "settled and dismissed with prejudice," were filed on March 6, 1978.

> *and unknown, and which have resulted or may in the future develop,* sustained by Irene Schulman, a minor, born on 3/25/70, or arising out of damage or loss direct or indirect sustained by the undersigned in consequence of an accident involving the automobile accident occurring on or about July 25, 1975. . . . [(emphasis supplied).]

Sometime following both consummation of the settlement and enrollment of the judgment, Irene developed epileptic symptoms that were diagnosed by a neurologist at Georgetown University Hospital as indicating a post-traumatic psychomotor seizure disorder resulting from a brain injury she sustained in the 1975 accident. In light of this revelation, the petition now before us to vacate the judgment and void the release was filed in the original law action instituted in August, 1977. By that pleading, Irene's mother individually and as her young daughter's next friend, together with the child's step-father (acting individually), sought to set aside both the March 2, 1978, release and judgment, on the ground that these liability acquittals were entered into, executed and delivered as a result of a mutual mistake of fact.

At the hearing on the nullification petition, which consisted of testimony relative to the recently manifested brain injury and argument of counsel, Judge McAuliffe made pertinent factual determinations as follows:

> I find from the present evidence that all parties and the Court were unaware that Irene had suffered brain damage as a result of the accident, but that the testimony of Dr. Cohan is clear and convincing that Irene had suffered such injury, and that it existed at the time of the settlement and judgment. I further find that Irene's mother and step-father had exercised reasonable diligence in attempting to ascertain the full nature and extent of Irene's injuries prior to entering into the settlement, and that the amount of the settlement would not have been found to be reasonable by the

parties or the Court if the additional element of a serious brain injury had been known.

\* \* \*

I . . . find that these parties intended to, and did, finally settle all claims for injuries known and unknown, and which had resulted or might in the future develop as a result of this accident.

With these factual determinations established, Judge McAuliffe then concluded that ignorance of the brain injury at the time of settlement constituted neither a mutual mistake of the variety which will in Maryland vitiate a release contract, nor was it a "mistake" as used in Rule 625 a so as to authorize a vacation of an enrolled judgment. He accordingly denied the relief requested. On appeal, the Court of Special Appeals agreed and affirmed the action of the trial court. *Bernstein v. Kapneck,* 46 Md. App. 231, 417 A.2d 456 (1980). We granted certiorari as this case poses issues without precise controlling precedent of this Court.

The releasors urge that we travel one of the circuitous paths tread by what is now a collective majority of our sister states and in this manner allow the petitioners here to avoid the enrolled judgment as well as the release which together place a formidable barricade across the usually traversed road to adequate compensation in personal injury cases. While it is true that a growing number of courts (despite a clear and unambiguous release for consideration of all known and unknown, as well as foreseen and unforeseen, claims for personal injuries) permit repudiation by a releasor when unanticipated injuries surface subsequent to the contract's execution, we do not believe these decisions can withstand critical analysis and decline to follow them.

Within the group of cases which numerically converge to form the majority, there are nuances in and a divergence among the rationales utilized in arriving at concordant results. While most of these authorities treat personal injury releases, because they relate to human interest instead of commercial transactions, as justifying the development of a special body of contract law, they basically utilize two differ-

ent types of underpinnings to vindicate the results reached. In the words of the Supreme Court of Oregon:

> Some cases seem to base relief upon real or supposed mutual mistake. E.g., *Clancy v. Pacenti,* 15 Ill. App. 2d 171, 145 N.E.2d 802, 71 A.L.R.2d 77 (1st Dist., 1951). *Contra, Thomas v. Hollowell,* 20 Ill. App. 2d 288, 155 N.E.2d 827 (4th Dist., 1959). Other cases seem to reform the release. Thus, the court rewrites it as if to read: "I release all claims for injuries presently known and appreciated by me, but reserve all aggravations and future disorders not presently known or discernible." See, e.g., *Couillard v. Charles T. Miller Hospital, Inc.,* 253 Minn. 418, 92 N.W.2d 96; *Ruggles v. Selby,* 25 Ill. App. 2d 1, 165 N.E.2d 733 (1st Dist., 1960). [*Wheeler v. White Rock Bottling Co. of Oregon,* 229 Or. 360, 366 P.2d 527, 529 (1961) (footnote omitted).]

A near exhaustive collection of the cases litigating issues related to the voiding of releases under the mutual mistake of fact theory may be found in the annotation located at 71 A.L.R.2d 82 (1960), and in its later case service. A quick walk through this compendium of cases demonstrates the existence of two conflicting legal principles — one imprisons the releasor within the terms of his contract; the other requires the releasee to fully account for his tort.[2] As we view it, the resolution of this conflict involves policy considerations, a fact which most of the courts taking the liberal position either fail to recognize or are reluctant to concede. On the one side, there are long established and well

---

2. For a discussion of settlement agreements in personal injury cases, see: Dobbs, *Conclusiveness of Personal Injury Settlements: Basic Problems,* 41 N.C.L. Rev. 665 (1963); Malina, *Unilateral Mistake of Fact in Personal Injury Releases,* 10 Clev. Mar. L. Rev. 70 (1961); Havighurst, *Problems Concerning Settlement Agreements,* 53 N.W.U.L. Rev. 283 (1958); Andrews, *The Personal Injury Release,* Ins. L.J., p. 212, April, 1965; Havighurst, *The Effect Upon Settlements of Mutual Mistake as to Injuries,* 12 Defense L.J. 1 (1963); Note, *Personal Injury Release and the Mistake of Fact,* 39 N.D.L. Rev. 421 (1963); Note, *Avoidance of a Release for Personal Injuries on the Ground of Mutual Mistake of Fact as to the Extent or Nature of the Injuries,* 19 U. Pitt. L. Rev. 111 (1957).

understood rules of contract law, which, at least in this State, normally apply to releases. *Parish v. Milk Producers Ass'n,* 250 Md. 24, 101, 242 A.2d 512, 555 (1968); *Thomas v. Erie Ins. Exchange,* 229 Md. 332, 340, 182 A.2d 823, 827 (1962). On the other side, there are considerations, largely stemming from compassion, which importune the larger number of courts to treat seemingly unambiguous and freely entered into personal injury releases as *sui generis,* so as to justify their permitting the releasor to renege on his bargain. We agree with the trial judge when he commented that the general policy considerations to be reckoned with were well articulated by the Supreme Court of Minnesota, when it said:

> There are at least two policy considerations that this court must balance in determining when voidance of personal injury releases should be permitted. One compelling argument in favor of a liberal policy is that the individual who lacks knowledge of his injuries because of fraud, concealment of facts, or mistake may sign a release and thereafter become a public charge. . . . However, it is also true that the law favors compromises, and there must be a zone of free action within which differences may be terminated by the parties with the complete assurance that the matter is final. "To permit [release settlements] to be vacated except for the most compelling reason creates 'uncertainty, chaos, and confusion' with respect to future dispositions, and is a disservice to other litigants whose matters are thereby delayed." [*Schmidt v. Smith,* 299 Minn. 103, 216 N.W.2d 669, 671-72 (1974).]

In balancing the policies that underlie the competing tenets here, we are convinced that our society will be best served by adherence to the traditional methodology for interpreting contracts in general, including other species of releases. Before explaining the reasons for this conclusion, we make several observations that impact on this result: (i) since (as already mentioned) releases in this State are

contractual, it follows that, in the absence of constitutional, statutory or clear important policy barriers, parties are privileged to make their own agreement and thus designate the extent of the peace being purchased, *Dist. Realty T. Ins. v. Jack Spicer R. Est.*, 280 Md. 422, 429, 373 A.2d 952, 956 (1977); (ii) particularly in this era of burgeoning litigation, compromise and settlement of disputes outside of court is to be encouraged and, thus, a release evidencing accord and satisfaction is a jural act of exalted significance which without binding durability would render the compromise of disputes superfluous, and accordingly unlikely; and (iii) because releases are contracts, conventional rules of construction dictate that when the scope of the agreement is stated in clear and unambiguous language, the words utilized to express this breadth should be given their ordinary meaning as there is no room for interpretation, *Parish v. Milk Producers Ass'n, supra; Thomas v. Erie Ins. Exchange, supra.* In this latter regard, it is appropriate that we repeat here our summary of just a few weeks ago in *Goldberg v. Goldberg*, 290 Md. 204, 428 A.2d 469 (1981), with respect to what is the longstanding law of this State regulating construction of such compacts.

> [S]ettlement agreements, as all other contracts scrutinized under the law of this State, are subject to interpretation in light of the settled and oft-repeated principles of objective construction. *Orkin v. Jacobson*, 274 Md. 124, 128, 332 A.2d 901, 903 (1975). "The written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding. . . ." *Slice v. Carozza Prop., Inc.*, 215 Md. 357, 368, 137 A.2d 687, 693 (1958). "[W]here a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed." *Kasten Constr. v. Rod Enterprises*, 268 Md. 318, 328, 301

A.2d 12, 18 (1973); *Little v. First Federated Life,*
267 Md. 1, 6, 296 A.2d 372, 375 (1972); *Devereux v.
Berger,* 253 Md. 264, 269, 252 A.2d 469, 471 (1969).
Thus, when interpreting [an] . . . agreement, this
Court is "bound to give effect to the plain meaning
of the language used." *Woodham v. Woodham,
supra* [235 Md. 356], 360, 201 A.2d [674,] 676;
*Sands v. Sands,* 252 Md. 137, 249 A.2d 187 (1969).

To this epitome we now add that the law of this State does
not permit contracts to be reformed or otherwise ignored
merely because of uncommunicated mental reservations
entertained by one of the parties at the time it was executed.
And as a matter of substantive law, parole evidence
ordinarily is inadmissible to vary, alter or contradict a
contract, including a release, that is complete and
unambiguous, in the absence of "fraud, accident or *mutual*
mistake." *McLain v. Pernell,* 255 Md. 569, 572, 258 A.2d 416,
418 (1969) (emphasis in original).

It is against this backdrop of principles, so often stated as
to be inculcated in the contract law of this State, that the
petitioners request they be absolved of responsibility under
the release, and in this way be freed to pursue additional
monetary relief for the newly discovered brain injury. In
explaining why we choose not to follow the path indicated by
the petitioners, we initially observe what most, if not all, of
the courts which adhere to the majority view concede: If
"from the particular language of the release or from the
circumstances of the negotiated settlement, there was a
conscious and deliberate intention to discharge liability
from all consequences of an accident, the release will be
sustained and bar any future claims of previously unknown
injuries." *Mangini v. McClurg,* 24 N.Y.2d 556, 301 N.Y.S.2d
508, 249 N.E.2d 386, 391 (1969); *Ranta v. Rake,* 91 *Idaho* 376,
421 P.2d 747, 755 (1967); *Denton v. Utley,* 350 Mich. 332, 86
N.W.2d 537, 542 (1957); *Hanson v. Northern States Power
Co.,* 198 Minn. 24, 268 N.W. 642, 644 (1936); *Boman v.
Johnson,* 83 S.D. 265, 158 N.W.2d 528, 530 (1968). See also
Annot., 71 A.L.R.2d 82, 160 (1960). This being true, it follows
then that the major policy considerations advanced to justify

this majority position — the victim not become a charge on the public, the tortfeasor (and normally an insurance carrier) be required to compensate injuries for which he is otherwise at law responsible (and, in the case of an insurance company, for which that corporation was itself paid to assume the risk) —are not in and of themselves overriding, so as to necessitate the creation of an absolute rule making this type of release unenforceable. Given the fact that a release of unknown injuries is almost universally permissible, it seems to us that the real issue, as is often the case involving contractual disputes, boils down to a question of the intent of the contracting parties. In making this essential and factual determination, the liberal stance casts aside the centuries old methodology utilized for the interpretation of contracts in favor of an approach which rejects the objective theory of contracts and is designed to elicit the supposed actual contractual consciousness of the releasor alone. This approach often overlooks or avoids the words used by the parties to express their agreement and in its place substitutes undefined conjecture as to what the releasor would have intended if the full extent of the injuries had been known at the time of the compact. Thus, these courts depart from the otherwise settled rules of construction which, for the most part, have operated satisfactorily for centuries, in order to dispose of particularly distressing cases in a compassionate and seemingly just manner.

Although we still would not agree with the ultimate determination, the conceptual basis of the opinions espousing the majority view would be more palatable if those courts had determined that the policy considerations in favor of permitting the voidance of a release of existing, but not yet known, injuries were so manifest and overwhelming that a rule was required which rendered such releases voidable. No decision we have found, however, arrives at this result by openly balancing these policies. Rather, the courts forming the majority attempt to justify the result they reach by an utterly inappropriate application of the mutual mistake of fact doctrine to factual circumstances which not only do not present a mutual misconception of basic fact, but often do not

appear to involve a mistake by even one party. Thus, the "mistake" found is the fact that the parties did not know the extent of the injuries suffered, notwithstanding that the releasor expressly assumed the risk (as parties to all contracts inevitably do) of the lack of omniscience as to what might develop in the future, by an express release of all unknown claims. In our view, the bastardization of the well-founded principles concerning mutual mistake of fact is entirely too high a price to pay for the obtention of an unprincipled, if temporarily desirable, result. We are not convinced that violence to the human body presents a unique situation such that an independent set of principles is required to interpret contracts concerning the injury, and indeed, we can conceive of a number of circumstances where a binding release of other types of claims can create hardship of an equal or greater dimension eliciting sympathy and compassion of comparable magnitude. If hardship is the criterion, then the line of enforceability should not be drawn in accordance with the nature of the claim, but rather the extent of the hardship suffered. If, on the other hand, the issue is (as we think) whether there has been a mutually intended release of unknown injuries then the nature and extent of the misfortune is beside the point, for the inquiry focuses on the intention of the parties to the contract and not on knowledge gained subsequent to its execution. Long ago, it was resolved that this intention is to be derived in the usual case from the meaning that an individual would normally ascribe to the words chosen by the parties to memorialize their agreement, and not from other evidence indicating "what the parties thought the agreement meant or intended it to mean." *Board of Trustees v. Sherman,* 280 Md. 373, 380, 373 A.2d 626, 629 (1977). In any event, this intent is *certainly* not to be garnered from evidence indicating that one party to an unambiguous contract alone had a disparate intent. *McLain v. Pernell, supra, Peters v. Butler,* 253 Md. 7, 12, 251 A.2d 600, 602-03 (1969). We believe our *McLain* decision goes a long way to refute the appellant's contrary assertion, because as that case makes quite clear under circumstances not unlike those now being presented, where "there is no evidence whatever to show

that the [releasee] did not understand ... the release to [mean] exactly what it said," there is no showing that a *mutual* mistake of fact existed. *McLain v. Pernell, supra* at 574, 258 A.2d at 418-19.

We also fail to see on what basis the principle of res judicata can be distinguished, as the majority view apparently does, from those principles favoring binding settlements, so that a judgment for damages entered after the trial of a claim for personal injuries, pursued without full knowledge of the extent of the harm suffered, cannot similarly be reexamined and voided. Nor do we perceive why there should be an appreciable difference between the effect of the bar resulting from a release and that encompassed in our statutes of limitations. Moreover, it seems to us that any fair concept of true mutuality would necessitate that in the reverse situation from that presented by this case — where a tortfeasor pays for injuries that are apparently permanent while in fact only temporary — the payor be allowed to similarly extricate himself from the consequences of the release contract and recover the amount given for the elusive injury. In short, to adopt the rationale advanced by the petitioner would signal a fundamental shift away from, or a disregard of, the significant tenet encouraging the finality of legal matters and claims which weaves its way through many aspects of our law and procedure.

Finally, we take notice that the General Assembly has perceived the existence of, and addressed, particular problems associated with the release of personal injury claims. By one statute, it has made any release of claims for personal injuries or any contract for legal representation with respect to recovery of damages for the tort, executed within five days of the casualty, voidable at the behest of the injured party at any time within sixty days. *See* Md. Code (1957, 1980 Repl. Vol.), Art. 79, § 11. Additionally, by another enactment, the legislature has ordained that settlement agreements and releases entered into by a victim of an alleged tort within fifteen days of the occurrence of the mishap under certain circumstances "shall not be utilized for any purpose in any legal action" connected with the injury. Code (1957, 1980

Repl. Vol.), Art. 79, § 12. Notably absent from the statutory law of this State is any further enactment voiding, modifying or otherwise affecting releases of unknown, but later manifested, injuries. This absence indicates to us that, in pondering the problems associated with the release of personal injuries, the legislature neither considered exoneration of unknown injuries to be against public policy nor discerned that releases of this type presented particular difficulties requiring some form of legislative control or regulation. We perceive no compelling reasons why this Court should do more.

We now return to the release presented by this case. In so doing we are confronted with the earlier quoted language releasing all claims "on account of bodily injuries, *known and unknown,* and which have resulted or *may in the future develop,* sustained by Irene Schulman . . . in consequence of . . . the automobile accident occurring on or about July 25, 1975." It is readily apparent from a mere glance at this verbiage that the release could not be more clear, more specific, more complete, more all-inclusive or more all-embracing. It would require turning the English language on its head to conclude that, from these words used, the releasors did not by this document exhibit a clear desire to extinguish the claim for the damages they now seek.[3] Moreover, since Judge McAuliffe specifically found as a fact that "all parties intended to and did finally settle all claims for injuries known and unknown" which resulted or might develop in the future as a consequence of the accident, even in most of the jurisdictions following the liberal view, this factual finding would prevent the further pursuit of damages. The release, therefore, effectively bars the petitioners' claim for the later discovered personal injuries.

Having concluded that the release here executed by the releasors now prohibits the collection of any supplemental

---

3. Additionally, we note a number of cases have indicated the fact that a release is given based on independent medical or legal advice, or both, as here, supports the conclusion there was an intentional release of unknown injuries. See cases collected in Annot., 71 A.L.R.2d 82, 116-17 (1960), and the later case service.

damages by them from the respondents for the July 25, 1975, accident, there remains no reason to consider whether the substantial additional barrier caused by entry of the consent judgment may be dislodged. Accordingly, we will affirm the judgment of the Court of Special Appeals.

*Judgment affirmed.*
*Costs to be paid by petitioners.*

*Davidson, J., concurring:*

The majority here expresses the view that "our society will be best served by adherence to the traditional methodology for interpreting contracts in general, including other species of releases." It states that "the bastardization of the well-founded principles concerning mutual mistake of fact is entirely too high a price to pay for the obtention of an unprincipled, if temporarily desirable, result." It concludes that it can "perceive no compelling reasons why this Court should" afford protection to persons who suffer an unforeseeable injury that develops after the execution of an agreement releasing claims for personal injuries.

Thus, the majority of this Court refuses to join the overwhelming majority of courts in other jurisdictions that have developed a special doctrine applicable to personal injury releases. This doctrine now permits a person who has agreed to release a claim for personal injury to be discharged from that contractual obligation if unforeseeable injuries develop after the agreement's execution. In my view, the majority here rigidly adheres to "a passion for aesthetic elegance, or for the appearance of an abstract consistency, to bring about obviously unjust results." *Ricketts v. Pennsylvania R. Co.,* 153 F.2d 757, 764 (2d Cir. 1946) (Frank, J., concurring).

As long ago as 1946, the difficulties inherent in the majority's analysis were painstakingly identified and eruditely articulated. In his concurring opinion, Judge Jerome Frank, believing "that not only is an important social policy involved but also that a good opportunity offers itself to

uncomplicate an excessively complicated set of legal rules," developed a sophisticated analysis of the underlying rationale for establishing a special doctrine applicable to personal injury releases. In *Ricketts,* 153 F.2d at 760-70, he said:

"In the early days of this century a struggle went on between the respective proponents of two theories of contracts, (a) the 'actual intent' theory — or 'meeting of the minds' or 'will' theory — and (b) the so-called 'objective' theory. Without doubt, the first theory had been carried too far: Once a contract has been validly made, the courts attach legal consequences to the relation created by the contract, consequences of which the parties usually never dreamed — as, for instance, where situations arise which the parties had not contemplated. As to such matters, the 'actual intent' theory induced much fictional discourse which imputed to the parties intentions they plainly did not have.

But the objectivists also went too far. They tried (1) to treat virtually all the varieties of contractual arrangements in the same way, and (2), as to all contracts in all their phases, to exclude, as legally irrelevant, consideration of the actual intention of the parties or either of them, as distinguished from the outward manifestation of that intention. The objectivists transferred from the field of torts that stubborn anti-subjectivist, the 'reasonable man'; so that, in part at least, advocacy of the 'objective' standard in contracts appears to have represented a desire for legal symmetry, legal uniformity, a desire seemingly prompted by aesthetic impulses. Whether (thanks to the 'subjectivity' of the jurymen's reactions and other factors) the objectivists' formula, in its practical workings, could yield much actual objectivity, certainty, and uniformity may well be doubted. At any rate, the sponsors of complete 'objectivity' in contracts largely won out in

the wider generalizations of the Restatement of Contracts and in some judicial pronouncements.

Influenced by their passion for excessive simplicity and uniformity, many objectivists have failed to give adequate special consideration to releases of claims for personal injuries, and especially to such releases by employees to their employers. Williston, the leader of the objectivists, insists that, as to all contracts, without differentiation, the objective theory is essential because 'founded upon the fundamental principle of the security of business transactions.'

He goes to great lengths to maintain this theory, using a variety of rather desperate verbal distinctions to that end. Thus he distinguishes between (1) a unilateral non-negligent mistake in executing an instrument (i.e., a mistake of that character in signing an instrument of one kind believing it to be of another kind) and (2) a similar sort of mistake as to the meaning of a contract which one intended to make. The former, he says, renders the contract 'void'; the latter does not prevent the formation of a valid contract. Yet in both instances 'the fundamental principle of the security of business transactions' is equally at stake, for there has been the same 'disappointment of well-founded expectations.' More than that, Williston concedes that a mistaken idea of one party as to the meaning of a valid contract (Williston's second category) 'may, under certain circumstances, be ground for relief from enforcement of the contract.' But he asserts that (a) such a contract is not 'void' but 'voidable,' and (b) that the granting of such relief is no exception to the objective theory, because this relief 'is in its origin equitable,' and 'equity' does not deny the formation of a valid contract but merely acts 'by subsequently * * * rescinding' it. His differentiation, moreover, of 'void' and 'voidable' has little if any practical

significance: He says that a 'voidable' contract will be binding unless the mistaken party sets up the mistake as a defense; but the same is obviously true of agreements which (because of unilateral mistakes affecting their 'validity') he describes as 'wholly void.'

It is little wonder that a considerable number of competent legal scholars have criticized the extent to which the objective theory, under Williston's influence, was carried in the Restatement of Contracts. One of them, Whittier, says that the theory, in its application to the formation of contracts, is a generalization from the exceptional cases; he points out that the theory of 'actual mutual assent' explains the great majority of the decisions, so that it would be better, he believes, to adhere to it, creating an exception for the relatively few instances where one party has reasonably relied on negligent use of words by the other. 'Why not,' asks Whittier, 'say that actual assent communicated is the basis of "mutual assent" except where there is careless misleading which induces a reasonable belief in assent?' There may be much in that notion: Williston admits that 'the law generally is expressed in terms of subjective assent, rather than of objective expressions * * *'; and that 'a doctrine which permits the rescission of a contract on account of a unilateral mistake approaches nearly to a contradiction of the objective theory * * *' As able a judge as Cuthbert Pound said, not long ago, 'The meeting of minds which establishes contractual relations must be shown.'

Another critic suggests that, in general, Williston, because he did not searchingly inquire into the practical results of many of his formulations, assumed, unwarrantably, without proof, that those results must invariably have a general social value, although (as Williston admits as to the objective theory) they are 'frequently harsh.'

In other realms of thought, attempted over-simplification has yielded complexities in practice. So here, as appears from the following.

Fortunately, most judges are too common-sensible to allow, for long, a passion for aesthetic elegance, or for the appearance of an abstract consistency, to bring about obviously unjust results. Accordingly, courts not infrequently have departed from the objective theory when necessary to avoid what they have considered an unfair decision against a person who, for a small sum, signed a release without understanding either the seriousness of his injury or the import of the words of the release, provided (1) he was not 'negligent' and (2) the other party (the releasee) had not, in reliance on the release, importantly 'changed his position.' Some courts, in some of the mistake cases, frankly abandon the 'objective' test, saying boldly that a non-negligent unilateral mistake justifies cancellation or rescission of a contract. As New York, a lively center of commerce, at least to some extent allows relief for such unilateral mistakes, it should be obvious that, contrary to Williston & Co., any deviation from the objective theory is not fatal to the functioning of business.

Some courts, however, escape marring the verbal symmetry of the objective theory, while actually abandoning it, thus: They say that a mistake by one party about a striking fact (sometimes called 'palpable') must be deemed to have been known to the other party, that, even if the evidence fails to show that he knew it, yet he had 'reason to know it' and is therefore to be treated as if he did; so that there results, by this device, which comes close to a fiction, a 'mutual mistake of fact.' This court, in pre-Erie-Tompkins days, in effect adopted that rule in a case where the plaintiff, before executing the release, had consulted her own physician. That thesis has been utilized especially when an

employee has given a release to his employer of all claims for an injury in consideration of a sum which approximates his lost wages (or his lost wages and medical expenses) and no more. Many courts have said that, on such a state of facts, it is impossible to believe that the releasor and releasee had in mind serious consequences of the injury which became apparent after the release was given, and therefore there was a 'mutual mistake of fact.'

Williston, realizing the desire of the courts to escape the objective theory in such cases, describes them as follows: 'Thus, where a release is given by one injured in an accident and more serious injuries develop than were supposed to exist at the time of settlement, it is a question of fact whether the parties assumed as a basis of the release the known injuries, or whether the intent was to make a compromise for whatever injuries from the accident might exist whether known or not. On a fair interpretation not only of the language of the instrument, but of the intention of the parties, the latter position is more likely, but presumably *out of tenderness for injured plaintiffs some courts have gone very far* in accordance with the former possibility.' [Emphasis in original.] (In the instant case, plaintiff's lawyer testified that he had received the report of a physician to the effect that plaintiff's injury was not serious. The evidence was, then, probably sufficient to bring this case within the mutual mistake rule; but I think the trial judge's instructions were such as not to leave that issue to the jury.)

Two approaches have been suggested which diverge from that of Williston and the Restatement but which perhaps come closer to the realities of business experience. (1) The first utilizes the concept of an 'assumption of risk': The parties to a contract, it is said, are presumed to undertake the risk that the facts upon the basis of which they

entered into the contract might, within a certain margin, prove to be non-existent; accordingly, one who is mistaken about any such fact should not, absent a deliberate assumption by him of that risk, be held for more than the actual expenses caused by his conduct. Otherwise, the other party will receive a windfall to which he is not entitled. (2) The second suggestion runs thus: Business is conducted on the assumption that men who bargain are fully informed as to all vital facts about the transactions in which they engage; a contract based upon a mistake as to any such fact as would have deterred either of the parties from making it, had he known that fact, should therefore be set aside in order to prevent unjust enrichment to him who made the mistake; the other party, on this suggestion also, is entitled to no more than his actual expenses. Each of those suggestions may result in unfairness, if the other party reasonably believing that he has made a binding contract, has lost the benefit of other specific bargains available at that time but no longer open to him. But any such possibility of unfairness will seldom, if ever, exist in the case of a release of liability for personal injury whatever the nature of the mistake (i.e., whether it fits into one or the other of Williston's categories).

In short, the *'security of business transactions' does not require a uniform answer to the question when and to what extent the non-negligent use of words should give rise to rights in one who has reasonably relied on them. That the answer should be favorable to the relier when the words are used in certain kinds of contracts, does not mean that it should also be when they are used in a release of a claim for personal injury; and there may be still further reasons for an unfavorable answer when the claim is by an employee against his employer.* [Emphasis in original.]

In all likelihood, it is because the courts have sensed the differentiated character of releases of

personal injury claims that the 'modern trend,' as Wigmore describes it, 'is to * * * develop a special doctrine * * * for that class of cases, liberally relieving the party who signed the release.' Surely much is to be said for that liberality, especially in a case where an employee has given a release of personal injury liability, without the fullest comprehension of what he was about, for a relatively small sum which turns out to be wholly inadequate.

In the admiralty cases, such relief has long been accorded seamen; the courts, calling them 'wards of admiralty,' have regarded them, in many of their dealings with their employers, as necessitous persons, under strong economic pressures, who, because of their helplessness, are to be protected from hard bargains, just as 'equity,' for similar reasons, protects mortgagors and beneficiaries of spendthrift trusts. The usual non-maritime employees, because they are under similar economic pressures, are no less helpless in their trafficking with their employers. It can truthfully be said of them what the admiralty decisions say of seamen: 'They are,' remarked Mr. Justice Story, 'considered as placed under the dominion and influence of men, who have naturally acquired a mastery over them; and as they have little of the foresight and caution belonging to persons trained in other pursuits of life, the most rigid scrutiny is instituted into the terms of every contract, in which they engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights of one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.' To men like plaintiff here, the following comment about seamen fully applies:

'They are \* \* \* placed too much in the power of the owners [i.e., employers] to be able to negotiate with them on equal terms.'

It is not surprising, then, that many courts — although without such direct expressions as those which adorn the seaman cases — have in fact in the release cases manifested, although obliquely, a not dissimilar guardianship of employees of large corporations. As already noted, the Supreme Court recently gave a broad hint that the admiralty doctrine is not as exceptional as is sometimes supposed. For reasons previously indicated, I think we should take that hint. It seems to me that the time has come to give up the elaboration of distinctions found in the judicial opinions relieving non-admiralty employees of their releases. I believe that the courts should now say forthrightly that the judiciary regards the ordinary employee as one who needs and will receive the special protection of the courts when, for a small consideration, he has given a release after an injury. As Mr. Justice Holmes often urged, when an important issue of social policy arises, it should be candidly, not evasively, articulated. In other contexts, the courts have openly acknowledged that the economic inequality between the ordinary employer and the ordinary individual employee usually means the absence of 'free bargaining.' I think the courts should do so in these employee release cases. And the federal courts, I think, should so hold in respect to liability pursuant to the Federal Employers' Liability Act. I think, therefore, that we should treat the plaintiff here as we would if he were a seaman.

Such a ruling will not produce legal uncertainty but will promote certainty — as anyone can see who reads the large number of cases in this field, with their numerous intricate methods of getting around the objective theory. Such a ruling would simply do directly what many courts have been doing

indirectly. It is fairly clear that they have felt, although they have not said, that employers should not, by such releases, rid themselves of obligations to injured employees, obligations which society at large will bear — either, by taxes, through the government or, by donations, through private charitable organizations.

The Pennsylvania Railroad Company warns us that, if a release given by an employee, advised by his own lawyer, is disregarded in a case like this, in the absence of fraud on the part of the employer, then employers will never hereafter settle with their employees who, to their grave disadvantage, will always in the future be forced to sue even for minor personal injury claims. That is a glib prediction based upon no evidence and intended to frighten the court. Sometimes judges have been persuaded by such prophecies which later events have shown to have been unfounded. So Choate, in Pollock v. Farmers' Loan & Trust Co., seemingly alarmed the majority of the Court by his forecast that a federal income tax would usher in a communist regime in this country. And it is well to recall Lord Abinger's dire prediction when in 1837 he enunciated the fellow-servant rule which the Employers Liability Act has wiped out: 'If the master be liable to the servant in this action, the principle of liability will be found to carry us to an alarming extent * * * The inconvenience, not to say the absurdity of these consequences, afford a sufficient argument against the application of this principle to the present case * * * In fact, to allow this action to prevail would be an encouragement to the servant to omit that diligence and caution which he is in duty bound to exercise on the behalf of his masters, to protect him against the misconduct of others who serve him, and which diligence and caution, while they protect the master, are a much better security against any injury the servant may

sustain by the negligence of others engaged under the same master, than any recourse against his master for damages could possibly afford.' Certainly, that prophecy went astray.

In New York, the rule as to releases is precisely that to which the Pennsylvania Railroad here objects; yet I venture to guess that thousands of settlements yearly are made in New York by employers who take the risk that, on a proper showing, the releases will be judicially disregarded. Where the amount paid in settlement is relatively small, very likely most employers are willing to take such a risk." (Footnotes omitted) (citations omitted.)

In his concurring opinion in *Ricketts,* Judge Frank extended the special doctrine applicable to personal injury releases from seamen to employees. He did not extend this doctrine to cases such as this in which the employer/employee relationship does not exist. Nonetheless, he recognized that the same social policy considerations that dictate the formulation and application of a special doctrine for personal injury releases for seamen and employees would also dictate that such a doctrine be extended to releases in other situations. As Judge Frank noted in *Ricketts,* 153 F.2d at 768-69 n.44:

"It has been suggested that the courts should recognize the inequality of bargaining strength in connection with other kinds of releases of personal injuries given for comparatively small sums: 'But it is believed that in many cases the individual tort claimant being solicited to release his claims is not in a position to defend his own interests even in the absence of coercive or fraudulent conduct on the part of his obligor, especially where that obligor is a powerful business organization, such as a railroad or insurance company. The prospect of a long and costly legal battle with such an opponent, often commanding almost unlimited resources, is enough to deter all but the most courageous or the most

> vindictive from taking action, especially where a tempting compromise settlement is offered in consideration of a release. It is conceivable that relief might be obtained in equity where gross inadequacy of benefits received or other circumstances render the agreement so unconscionable as to warrant equitable action.'"

I perceive compelling social policy considerations that dictate that this Court now establish a special doctrine generally applicable to cases involving personal injury releases. In my view, it is time to acknowledge that the ordinary person who suffers personal injury lacks bargaining strength, ordinarily is not in a position to defend his own interests, and, therefore, requires the special protection of the courts. Accordingly, I would hold that generally a person who has released a claim for personal injury be discharged from the contractual obligation if unforeseeable injuries develop after the execution of the agreement. To this extent, I respectfully disagree with the majority.

I would not consider the question whether the special doctrine generally applicable to personal injury releases is applicable in this particular case in which the trial court found as a fact "that these parties intended to, and did, finally settle all claims for injuries known and unknown, and which had resulted or might in the future develop as a result of this accident." The record here shows that after the release was executed, a consent judgment was entered. In my view, there was no "mistake" that would justify an exercise of the trial court's revisory power over an enrolled judgment. *Hughes v. Beltway Homes, Inc.,* 276 Md. 382, 383-84, 386-89, 347 A.2d 837, 838-42 (1975); *Brunecz v. DiLeo,* 263 Md. 481, 482-84, 283 A.2d 606, 607 (1971); Md. Rule 625 a. Thus, even if the special doctrine were applicable here, there could be no recovery. Under these circumstances, I concur in the majority's result. I, too, would affirm the judgment of the Court of Special Appeals.